DANIEL KELLY, J.
¶ 1. Vincent Milewski and Morganne MacDonald (collectively, the "Milewskis") own a home in the Town of Dover. They want to challenge a tax assessor's recent revaluation of their property. But they also want to prevent the tax assessor from inspecting the interior of their home as a part of that process. The Town says our statutes require them to pick one or the other because they cannot do both.[1] The Milewskis ask us whether the Town can put them to this choice.[2]
*47 I. BACKGROUND
¶ 2. The Milewskis bring us a discrete question, but we see that the answer will play out against an intricate and delicately balanced set of tax statutes and constitutional provisions. Although the following background provides little more than a broad sketch of Wisconsin's system of real property taxation, it should be enough to place the Milewskis' question in an understandable context.
A. Wisconsin's tax assessment scheme
¶ 3. Article VIII, section 1 of the Wisconsin Constitution, known as the Uniformity Clause, requires the uniform taxation of real property,[3] and Wis. Stat. ch. 70 provides the general procedure by which munici *48 palities carry out this duty. In Wisconsin, "[r]eal property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under [Wis. Stat. § 73.03(2a)] from actual view or from the best information that the assessor can practicably obtain . . .." Wis. Stat. § 70.32(1) (2015-16)[4] (emphasis added). The Wisconsin Property Assessment Manual provides that "[i]n the case of real property, actual view requires a detailed viewing of the interior and exterior of all buildings and improvements and the recording of complete cost, age, use, and accounting treatments." Wis. Dep't of Revenue, Wisconsin Property Assessment Manual, 10-55 (2017).
¶ 4. If the property owner is dissatisfied with the assessor's valuation, he may bring his objection to the local board of review. Wis. Stat. § 70.47(7)(a).[5] He may do so, however, only after he has first allowed a tax assessor to view his property:
No person shall be allowed to appear before the board of review, to testify to the board by telephone or to contest the amount of any assessment of real or personal property if the person has refused a reasonable written request by certified mail of the assessor to view such property.
Wis. Stat. § 70.47(7)(aa). At the board of review hearing, the owner may present evidence in support of what he believes to be the proper valuation. Wis. Stat. § 70.47(8). Based on that evidence, the board of review decides whether to adjust the assessor's valuation. *49 Wis. Stat. § 70.47(9)(a). If the owner disagrees with the board of review's conclusion, he may seek certiorari review by the circuit court. Wis. Stat. § 70.47(13).
¶ 5. Some property owners, however, may want a circuit court, rather than the town's board of review, to make the initial determination of whether the assessor's valuation is accurate. Such an owner may file a claim for excessive assessment in the circuit court under Wis. Stat. § 74.37(2). He must still, however, follow the pre-hearing procedures for challenging the valuation before the board of review, as outlined above: "No claim or action for an excessive assessment may be brought under this section unless the procedures for objecting to assessments under [§] 70.47 .. . have been complied with." Wis. Stat. § 74.37(4)(a). After completing these pre-hearing procedures, the owner asks the board of review for a hearing waiver. Wis. Stat. § 70.47(8m). Once granted, the owner may file his complaint in the circuit court.
B. The Town of Dover Revalues the Milewskis' Property
| 6. In 2013, the Town of Dover reassessed all the properties in its jurisdiction and contracted with Gar-diner Appraisal Service, LLC ("Gardiner") to assign a value to each such property. Gardiner's attention eventually turned to the Milewskis' home (the "Property"), which had a pre-2013 assessed value of $273,900, and an estimated fair market value of $277,761. Gardiner sent the Milewskis a notice stating that it "must view the interior of your property for the Town wide revaluation program which is in progress" and that "[a]n assessor will stop to view your property on Tues, Aug 20 at 6:10 pm."
*50 ¶ 7. When the assessor arrived, Ms. MacDonald invited him into their yard and told him he was welcome to view the Property's exterior; however, she further informed him he would not be allowed inside the home. The assessor declined Ms. MacDonald's invitation to view the Property's exterior and left without asking her any questions about the Property.
¶ 8. A few months later, the Milewskis received a certified letter from Gardiner stating that the assessor had not "viewed the interior of your buildings" and asked that they schedule a time for him to do so. The Milewskis sent the Town a letter objecting to the requested interior inspection. Gardiner made no further attempt to view the interior of the Property and assessed it at a value of $307,100—a 12.12 percent increase from the previous assessment of $273,900.[6]
¶ 9. After learning of the new assessment, Mr. Milewski attended open book sessions to review the assessed values of other properties in the subdivision.[7] Based on his research, Mr. Milewski learned that of the 43 parcels in the subdivision, only four properties, including the Milewskis', did not have their interiors inspected during the 2013 assessment. Of those four properties, all four saw an increase in their initial assessment. The other 39 properties that did have their interiors inspected saw their assessed value decrease. After receiving the initial assessments, the owners of two of the four properties that had not had their interiors inspected allowed Gardiner to conduct *51 an inspection of their home's interior and the assessments for those properties were then reduced. Thus, the only two properties in the 43—parcel subdivision that saw an increased assessment during the 2013 revaluation were those two properties where the owners did not consent to Gardiner's view of their home's interior.
C. The Milewskis Protest the Revaluation of the Property
¶ 10. The Milewskis filed an "Objection Form for Real Property Assessment" with the Town, and about two weeks later, they appeared at the November 25, 2013 Dover Board of Review ("BOR") hearing, where they intended to object to the assessment of their Property. However, because the BOR determined they had refused "a reasonable request by certified mail of the assessor to view [their] property," the BOR refused to hear their objection.
¶ 11. The Milewskis paid their 2013 property taxes and filed a Notice of Claim and Claim with the Town Clerk under Wis. Stat. § 74.37, alleging the Property assessment was excessive and that the Town had violated their Fourth Amendment rights. The Town denied the Milewskis' claim by taking no action on it within 90 days. See Wis. Stat. § 74.37(3)(a). The Milewskis later followed the same procedure for their 2014 property taxes, with the same result.
¶ 12. The Milewskis commenced this case with a complaint that included a claim for excessive assessment under Wis. Stat. § 74.37, and a claim that Wis. Stat. § 70.47(7)(aa) and Wis. Stat. § 74.37(4)(a), as applied to the Milewskis, are unconstitutional because they conditioned their right to challenge the assessor's *52 valuation of the Property on submission to a search of their home. The parties filed cross-motions for summary judgment. The circuit court granted the Town's, the BOR's, and Gardiner's motions and dismissed the Milewskis' claims. The court of appeals affirmed the circuit court, and we granted the Milewskis' petition for review.
II. STANDARD OF REVIEW
¶ 13. Summary judgment is appropriate when there are no genuine disputes as to any material facts and the moving party is entitled to judgment as a matter of law. See Wis. Stat. § 802.08(2). We review a grant of summary judgment de novo, applying the same methodology as the circuit court. Belding v. Demoulin, 2014 WI 8, ¶ 13, 352 Wis. 2d 359, 843 N.W.2d 373. While our review is independent from the circuit court and court of appeals, we benefit from their analyses. See Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶ 16, 360 Wis. 2d 129, 857 N.W.2d 136.
¶ 14. A facial challenge to a statute's constitutionality also presents a question of law that we review de novo. Aicher v. Wis. Patients Comp. Fund, 2000 WI 98, ¶ 18, 237 Wis. 2d 99, 613 N.W.2d 849. We presume statutes are constitutional; the party asserting the constitutional infirmity must establish its argument beyond a reasonable doubt. State v. Wood, 2010 WI 17, ¶ 15, 323 Wis. 2d 321, 780 N.W.2d 63.
f 15. The Milewskis say they are not contesting the constitutionality of the statutes in question, only how they were applied to them. In such a challenge *53 there is no presumption the statute has been applied in a constitutional manner. In re Gwenevere T., 2011 WI 30, ¶ 48, 333 Wis. 2d 273, 797 N.W.2d 854 ("neither party faces a presumption that the statute was constitutionally applied."). We assume the constitutionality of the statutes, and require the challenger to prove the unconstitutional application of the statutes beyond a reasonable doubt. Soc'y Ins. V. LIRC, 2010 WI 68, ¶ 27, 326 Wis. 2d 444, 786 N.W.2d 385; In re Gwenevere T., 333 Wis. 2d 273, ¶ 47 (In an "as-applied" challenge, "the presumption that the statute is constitutional applies, just as it does in a facial challenge.").
III. DISCUSSION
¶ 16. The Milewskis understand themselves to be on the horns of a dilemma. The Town told them they must either submit to a tax assessor's inspection of the interior of their home or lose the right to challenge the revaluation of their Property. The Milewskis say the Town may not make them ransom their due process rights with a search of their home. The Fourth and Fourteenth Amendments, they say, protect the sanctity of their home as well as their right to contest the Town's revaluation.[8] Put to the choice between the two, the Milewskis opted not to allow the tax assessor's inspection. So the Board of Review refused to hear their challenge.
¶ 17. The Town sees no dilemma. Instead, it sees only a polite request to enter a home to perform the reasonable task of determining how much it is worth so that the Town may properly allocate the tax burden, *54 as contemplated by our statutes and the Wisconsin Constitution. See Wis. Const. art. VIII, § 1; Wis. Stat. § 70.01. The Town readily admits the Milewskis may not challenge their assessment if they do not grant the inspection request. But it maintains that a tax assessor's "viewing" of the interior of the Milewskis[1] property is not a "search" within the meaning of the Fourth Amendment. Even if such a viewing constitutes a search, the Town says, it is either self-evidently reasonable, or it is exempted from the Fourth Amendment's operation by the "compelling 'special' need to look inside people's homes" to satisfy the constitutional requirement that taxation of all properties in the Town be uniform. In any event, the Town says, one of the alleged horns is missing, so there can be no dilemma.
¶ 18. The task before us is straightforward. First, we must determine whether the Milewskis' situation affects the constitutionally-protected rights they asserted. So we will examine whether there is a due-process right to contest a tax assessor's valuation of real property, and whether a tax assessor's noncon-sensual, warrantless inspection of the interior of a home would be an unreasonable search. Second, if this situation really does implicate two constitutionally-protected rights, we will inquire into whether the exercise of one can be conditioned on surrender of the other. And finally, if this conditioning is impermissible, we must determine whether it results from an inexorable statutory command, or is instead the result of how the Town applied the statutes to the Milewskis.
A. Rights Claimed by the Milewskis
1. Due Process
¶ 19. The Milewskis were unable to challenge the revaluation of their Property before the Board of *55 Review because the Town said Wis. Stat. § 70.47(7)(aa) rebuffs all those who do not first submit to a tax assessor's inspection of the interior of their homes. And they found the courthouse doors barred because Wis. Stat. § 74.37(4)(a) requires them to follow the procedural requirements of § 70.47, including the interior home inspection, before filing an excessive assessment claim. So their taxes have increased, but without any corresponding opportunity for administrative or judicial review of the added burden.
¶ 20. The Milewskis say the Town may not impose a tax that is not ultimately subject to judicial review without violating their due-process rights. A due-process challenge requires the complainant to establish two components. First, she must prove she has been deprived of a recognized right. Aicher, 237 Wis. 2d 99, ¶ 80. And second, she must prove that she has not been afforded process commensurate with the deprivation. Id. The focus of such claims is not on whether the State may infringe the right in question, but whether it has engaged the proper procedure in doing so. "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." Zinermon v. Burch, 494 U.S. 113, 125 (1990). This constitutional guarantee protects an individual from the erroneous exercise of the State's authority. "Procedural due process rules are meant to protect persons .. . from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978). "Such rules 'minimize substantively unfair or mistaken deprivations of life, liberty, or property by enabling persons to *56 contest the basis upon which a State proposes to deprive them of protected interests." Id. at 259-60.
¶ 21. The United States Constitution specifically extends the guarantee of due process to the deprivation of property: "No state shall. . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. Our Wisconsin constitution provides that "[a] 11 people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." Wis. Const. art. 1, § 1. Although the text of the U.S. and Wisconsin constitutional provisions differ, they "provide identical procedural due process protections." Cty. of Kenosha v. C & S Mgmt., Inc., 223 Wis. 2d 373, 393, 588 N.W.2d 236 (1999).
¶ 22. For constitutional purposes, a tax is a deprivation of property: "[E]xaction of a tax constitutes a deprivation of property ... ." McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco, Dep't. of Business Regulation of Fla., 496 U.S. 18, 36 (1990). Consequently, a state imposing a tax "must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause." Id.
¶ 23. We know the nature of these safeguards well: "The elements of procedural due process are notice and an opportunity to be heard, or to defend or respond, in an orderly proceeding, adapted to the nature of the case in accord with established rules." State v. Thompson, 2012 WI 90, ¶ 46, 342 Wis. 2d 674, *57 818 N.W.2d 904 (quoting 16C C.J.S. Constitutional Law § 1444, at 188 (2005)); see also Penterman v. Wis. Elec. Power Co., 211 Wis. 2d 458, 474, 565 N.W.2d 521 (1997) (Due Process "entitles the individual to a fair opportunity to present his or her claim."). The review must be "adequate, effective, and meaningful." Bounds v. Smith, 430 U.S. 817, 822 (1977), overruled in part on other grounds by Lewis v. Casey, 518 U.S. 343 (1996). Whether the process is pre-deprivation or post, it must certainly occur:
[W]e have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest,. .. [but] it is well established that a State need not provide predeprivation process for the exaction of taxes.
McKesson Corp., 496 U.S. at 37 (internal citations and marks omitted).
¶ 24. The Milewskis have been subjected to a tax—a deprivation of property—but they have been forbidden any process by which to challenge it. So, absent an adequate explanation for how this came to pass, they have been denied their Fourteenth Amendment due-process rights.[9] The Town says there has been no violation because the Milewskis made the *58 affirmative decision to deny the tax assessor an interior inspection of their home. Foreclosing an administrative or judicial review of the revaluation, they say, is the "legal, logical, and natural result" of that decision, for to do otherwise would be "inconsistent with well-established law on the property owner's burden of proof because the homeowner has the affirmative burden of proving that the fair market value is different than the assessor's determination being challenged." Thus, "[wjithout putting the interior of their home— *59 which comprises about 70% of its value—into evidence," the Town concludes, "the homeowners logically, and equitably, cannot meet their burden of proving the fair market value is different from what the assessor determines."
¶ 25. This argument conflates two important, but distinct, principles. The right to a hearing is not the same thing as the burden of proof one must satisfy by the end of that hearing. Nor do the concepts protect the same interests. The former ensures access to a neutral magistrate to resolve disputes and is constitutionally guaranteed. The latter is a prudential recognition that he who seeks to change the status quo must overcome its inertia, and is subject to adjustment based on policy considerations.[10]
¶ 26. We agree with the Town that the Milewskis must be prepared to offer evidence sufficient to overcome the assessor's conclusion if they hope to change the Property's valuation. A challenger must "in good faith presentí] evidence to such board [of review] in support of such objections and [make] full disclosure before said board, under oath of all of that person's property liable to assessment in such district and the value thereof." Wis. Stat. § 70.47(7)(a). This obligation *60 is significant because the assessor's valuation is presumptively correct. Wis. Stat. § 70.47(8)(i) ("The board shall presume that the assessor's valuation is correct. That presumption may be rebutted by a sufficient showing by the objector that the valuation is incorrect."); Wis. Stat. § 70.49(2) ("The value of all real and personal property entered into the assessment roll. .. in all actions and proceedings involving such values, [is] presumptive evidence that all such properties have been justly and equitably assessed in proper relationship to each other."). We express no opinion on whether the Milewskis will be able to carry their burden of proof upon the contest of the Property's value, but that has nothing to do with whether they have the right to hazard the attempt. The Milewskis may not be denied due process with respect to the revaluation of their Property.[11]
2. Freedom From Unreasonable Searches
I 27. We next determine whether a tax assessor's warrantless inspection of the interior of a home would *61 be an unreasonable search. On this subject, the Fourth Amendment to the United States Constitution says:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV. Its Wisconsin counterpart, found in Article I, section 11 of the Wisconsin Constitution,[12] is substantively identical, and we normally interpret it coextensively with the United States Supreme Court's interpretation of the Fourth Amendment.[13] See, e.g., State v. Dumstrey, 2016 WI 3, ¶ 14, 366 Wis. 2d 64, 873 N.W.2d 502 (citing State v. Arias, 2008 WI 84, ¶ 20, 311 Wis. 2d 358, 752 N.W.2d 748).
¶ 28. The constitutionality of a tax assessor's inspection of the interior of a home turns on three questions. First, whether the inspection is a search at all within the meaning of the Fourth Amendment. Second, whether the inspection (if it is a search) fits within a recognized exception to the Fourth Amendment's operation. And third, if no recognized exception covers the inspection, whether it is nonetheless reasonable.
*62 a. Is an "Interior View" a "Search"?
¶ 29. Whether a tax assessor's "viewing" has constitutional significance depends on what the term "search" meant at the time of the Fourth Amendment's adoption. Kyllo v. United States, 533 U.S. 27, 34 (2001) (The court must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."). To obtain a baseline understanding of what manner of intrusion comprises a "search," the United States Supreme Court recently had reference to the English case of Entick v. Carrington.[14] See United States v. Jones, 565 U.S. 400, 404-05 (2012). The Court had previously described this case (Entick) as a " 'monument of English freedom' " that was "undoubtedly familiar to every American statesman at the time the Constitution was adopted, and considered to be the true and ultimate expression of constitutional law . . . ." Brower v. Cty. of Inyo, 489 U.S. 593, 596 (1989) (internal marks omitted) (quoting Boyd v. United States, 116 U.S. 616, 626 (1886) (overruled on other grounds).
¶ 30. In Entick, the Jones Court found a close connection between "searches" and the law of trespass. Jones, 565 U.S. at 405. There, Lord Camden admonished that" '[o]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbour's ground, he must justify it by law.' " Jones, 565 U.S. at 405 (quoting Entick, 95 Eng. Rep. at 817).[15] With that principle in mind, the *63 Jones Court had no difficulty concluding a search occurred when government agents attached a tracking device to an individual's automobile. Id. at 404-05. When "[t]he Government physically occupie[s] private property for the purpose of obtaining information [,]" the Court said, there is "no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." Id. at 404; State v. Sobczak, 2013 WI 52, ¶ 12, 347 Wis. 2d 724, 833 N.W.2d 59 (same).[16]
¶ 31. When the government proposes to enter a home to obtain information relevant to levying a tax, we have even more precise historical guidance at hand. "In order to ascertain the nature of the proceedings intended by the fourth amendment to the constitution under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England." Boyd, 116 U.S. at 624-25. One of those controversies, which still informs our view of the Fourth Amendment, was the practice of granting revenue agents general warrants to search homes for taxable items:
"Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance *64 had given customs officials blanket authority to search where they pleased for goods imported in violation of British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,[1] because they placed 'the liberty of every man in the hands of every petty officer.' The historic occasion of that denunciation, in 1761 at Boston, has been characterized as 'perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country.'"
Payton v. New York, 445 U.S. 573, 583 n.21 (1980) (quoting Stanford v. Texas, 379 U.S. 476, 481—82 (1965) (quoting Boyd, 116 U.S. at 616, 625)).
¶ 32. This history tells us that, at the time the Fourth Amendment was adopted, a "search" occurred when a government agent trespassed on private property in pursuit of revenue-raising information. Our statutes preserve the home's sanctity against revenue agents by making it clear that tax assessors trespass if they enter a home without consent. See Wis. Stat. § 943.13(4m)(am)4. (no trespass exemption for tax assessors entering residences or buildings within curti-lage); see also Wis. Stat. § 70.05(4m) ("A property owner may deny entry to an assessor if the owner has given prior notice to the assessor that the assessor may not enter the property without the property owner's permission."). So, as Entick observed, and Jones confirmed, if a tax assessor " 'will tread upon his neigh-bour's ground, he must justify it by law.' " Jones, 565 U.S. at 405 (quoting Entick, 95 Eng. Rep. at 817).
¶ 33. This is not, however, how the Town views its proposed inspection of the Milewskis' home. It sees the Fourth Amendment primarily through a proce *65 dural lens in which the purpose for the government agent's presence in the home is less significant than the manner by which he came to be there. It says no search takes place under these circumstances because the assessor sends a letter that provides "advance notice to homeowners when requesting to view their home for an assessment," which "explains the purpose behind the assessment, the right to refuse the request and the consequences of that refusal." "[T]he advance notice [] gives the homeowner ample opportunity to question the legitimacy, nature, and scope of the assessment." The interior view does not "involve a 'true search for violations,' " and there are no "criminal consequences for denying entry." Instead, refusal "re-sultfs] only in possible financial consequences that the homeowner is informed of before choosing" whether to allow the tax assessor entry to her home. These procedures, and their attendant limitations on a government agent's discretion, inform the Town's conclusion that no search occurs when an assessor enters a home in search of something to tax.
¶ 34. The Town's argument, however, gets a little ahead of itself. The question at this stage of the analysis is whether the tax assessor would be performing a search within the meaning of the Fourth Amendment by viewing the interior of the Milewskis' home. Whether he gives advance notice of when the viewing will occur, or provides assurance that refusing him an audience will cause merely financial penalties, may or may not have something to say about the reasonableness of a search, but it says nothing about whether his "viewing" belongs in the Fourth Amendment "search" category. The Jones Court cast that query in strictly functional terms, declaring that a search occurs when "[t]he Government physically occupie[s] private prop *66 erty for the purpose of obtaining information." 565 U.S. at 404. The formalities surrounding the viewing do not define what the viewing actually is.
¶ 35. The Town offered Wyman v. James as an example of how a government agent may enter a home without triggering a search within the meaning of the Fourth Amendment. 400 U.S. 309 (1971). The eponymous Mrs. James applied for, and received, financial benefits under the federal Aid to Families with Dependent Children program ("AFDC"). Id. at 313-14. The State of New York, in administering the AFDC program for state residents, required periodic home visits by a caseworker to ensure the beneficiaries were putting program funds to the intended uses. See id. at 313-16. Mrs. James filed a civil rights action alleging the home visits were searches that violated the Fourth Amendment. Id. at 314-15.
¶ 36. The Supreme Court did not agree. It acknowledged that the visits had both "rehabilitative and investigative" aspects, but brushed off the latter because it "is given too broad a character and far more emphasis than it deserves if it is equated with a search in the traditional criminal law context." Id. at 317. Concentrating instead on the consensual nature of home visits, and the fact that withholding consent merely stopped the flow of AFDC benefits, the Court found no search within the meaning of the Fourth Amendment:
We note, too, that the visitation in itself is not forced or compelled, and that the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and there is no search.
*67 Id. at 317-18. Underlining the importance of consent to its analysis, the Court signaled that the home visits could become searches should they lose their consensual nature:
If however, we were to assume that a caseworker's home visit, before or subsequent to the beneficiary's initial qualification for benefits, somehow (perhaps because the average beneficiary might feel she is in no position to refuse consent to the visit), and despite its interview nature, does possess some of the characteristics of a search in the traditional sense, we nevertheless conclude that the visit does not fall within the Fourth Amendment's proscription. This is because it does not descend to the level of unreasonableness. It is unreasonableness which is the Fourth Amendment's standard.
Id. at 318.
¶ 37. Wyman provides no assistance in determining whether the tax assessor's proposed view of the interior of the Milewskis' home is a Fourth Amendment search. It does not actually define what manner of activity qualifies as a search for Fourth Amendment purposes. Instead, it asks whether the homeowner has excused the government agent from complying with constitutional requirements at all. The Fourth Amendment, of course, does not prohibit consensual searches. See, e.g., Florida v. Bostick, 501 U.S. 429, 439 (1991) ("The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation"); see also, United States v. Williams, 521 F.3d 902, 905 (8th Cir. 2008) ("Consensual searches do not violate the Fourth Amendment. . . ."). The Fourth Amendment is no barrier to consensual searches not because the activity is not a search, but because *68 consent removes the search from Fourth Amendment scrutiny. So it is only in the absence of consent that we need to determine whether a certain activity has constitutional significance. Because Wyman relied on consent as the decisional principle, it did not explicitly decide whether the caseworker's activity in Mrs. James' home constituted a search.
¶ 38. The Town argues that if the Milewskis and Mrs. James' situations are not sufficiently comparable, we should analogize this case to an analogy employed by the Wyman Court:
It seems to us that the situation is akin to that where an Internal Revenue Service agent, in making a routine civil audit of a taxpayer's income tax return, asks that the taxpayer produce for the agent's review some proof of a deduction the taxpayer has asserted to his benefit in the computation of his tax. If the taxpayer refuses, there is, absent fraud, only a disallowance of the claimed deduction and a consequent additional tax. The taxpayer is fully within his "rights" in refusing to produce the proof, but in maintaining and asserting those rights a tax detriment results and it is a detriment of the taxpayer's own making. So here Mrs. James has the "right" to refuse the home visit, but a consequence in the form of cessation of aid, similar to the taxpayer's resultant additional tax, flows from that refusal. The choice is entirely hers, and nothing of constitutional magnitude is involved.
400 U.S. at 324.
¶ 39. This analysis offers no guidance and, indeed, illustrates the limited utility of recursive analogies. An analogy is helpful when it illuminates a central proposition by considering it in a different, but logically related, context. Building one analogy on another risks shifting the focus from the central proposition to something peripheral, as occurred here. The *69 Wyman Court employed the IRS analogy in determining whether the caseworker's home visit was constitutionally reasonable. That is, it was not using the analogy to determine whether the home visit was a search—it was assuming, as part of its premises, that the visit was a search within the Fourth Amendment's comprehension. So when the Town asserts a "viewing" is not a search because, like "the hypothetical plaintiff in the [Wyman] Court's example, Milewski and MacDonald face no criminal penalties for refusing entry into their home[;] [t]he only consequence is a tax detriment of their own making," it builds its foundation on the IRS analogy's premise that the visit was a search. Thus, the recursive analogies resulted in a petitio principii error (positing an argument's conclusion in the premises). Wyman's analogy, therefore, has nothing instructive to say about whether an "interior viewing" is a search within the meaning of the Fourth Amendment.
¶ 40. In determining whether a tax assessor conducts a constitutionally-significant search when viewing the interior of a home, we apply the elegantly simple Jones formulation: If a government agent occupies private property for the purpose of obtaining information, he is conducting a search within the meaning of the Fourth Amendment. The Town's own argument confirms this would be a search. It is the Town's central point that a tax assessor must physically enter the Milewskis' home to conduct an interior view. And by describing the viewing as "a simple requirement that taxpayers disclose the information relevant to the value of their home," the Town admitted the purpose of the assessor's presence would be to obtain revenue-related information. Thus, a tax asses *70 sor who enters a home to conduct an "interior view" occupies private property for the purpose of obtaining information and is therefore conducting a search within the meaning of the Fourth Amendment.
b. Exception to the Fourth Amendment
¶ 41. The Town asserts that a tax assessor's search of a home fits within the "special needs" exception to the Fourth Amendment's protection. It refers us to City of Indianapolis v. Edmond for instruction. 531 U.S. 32 (2000). There we find that the United States Supreme Court has recognized a mélange of circumstances in which searches are constitutionally reasonable even in the absence of individualized suspicion of wrongdoing:
[W]e have upheld certain regimes of suspicionless searches where the program was designed to serve "special needs, beyond the normal need for law enforcement." See, e.g., Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646 (1995) (random drug testing of student-athletes); Treasury Emps. v. Von Raab, 489 U.S. 656 (1989) (drug tests for United States Customs Service employees seeking transfer or promotion to certain positions); Skinner v. Ry. Labor Execs. Assn., 489 U.S. 602 (1989) (drug and alcohol tests for railway employees involved in train accidents or found to be in violation of particular safety regulations). We have also allowed searches for certain administrative purposes without particularized suspicion of misconduct, provided that those searches are appropriately limited. See, e.g., New York v. Burger, 482 U.S. 691, 702-704 (1987) (warrantless administrative inspection of premises of "closely regulated" business); Michigan v. Tyler, 436 U.S. 499, 507-509, 511-512 (1978) (administrative inspection of fire-damaged premises to determine cause of blaze); Camara v. Mun. *71 Court of City and Cty. of San Francisco, 387 U.S. 523, 534-539 (1967) (administrative inspection to ensure compliance with city housing code).
Edmond, 531 U.S. at 37. The Town asks us to add tax assessment searches to this potpourri because revenue collection is a "special need," and the search is "not aimed at all at criminal—or even civil code— enforcement."
¶ 42. Whatever the merits of those exceptions, the Town has not directed our attention to any case suggesting that assessing or collecting taxes is a need so special that it excuses compliance with the Fourth Amendment. Nor have we found any. To the contrary, G.M. Leasing Corp. v. United States, 429 U.S. 338 (1977), teaches that the Fourth Amendment admits of no "tax revenue" special exception. In that case, the Court considered whether United States revenue agents could enter a corporation's business offices without a warrant to seize various books and records useful to their tax collection efforts. See id. at 352-53. The United States made an argument similar to what the Town offers us: "The respondents argue that there is a broad exception to the Fourth Amendment that allows warrantless intrusions into privacy in the furtherance of enforcement of the tax laws." Id. at 354. It also maintained that "the history of the common law in England and the laws in several States prior to the adoption of the Bill of Rights support the view that the Fourth Amendment was not intended to cover intrusions into privacy in the enforcement of the tax laws." Id. at 355.
¶ 43. After noting the government's unquestionable authority to "lay and collect Taxes," the Court nonetheless recognized that "one of the primary evils *72 intended to be eliminated by the Fourth Amendment was the massive intrusion on privacy undertaken in the collection of taxes pursuant to general warrants and writs of assistance." Id. The Court found no evidence supporting the United States' assertion that the Fourth Amendment was historically understood as not reaching matters of revenue. Id. ("We do not find in the cited materials anything approaching the clear evidence that would be required to create so great an exception to the Fourth Amendment's protections against warrantless intrusions into privacy."). So the Court affirmed the Fourth Amendment's application to searches in aid of tax revenues: "The intrusion into petitioner's office is therefore governed by the normal Fourth Amendment rule that 'except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.'" G.M. Leasing Corp., 429 U.S. at 358 (quoting Camara, 387 U.S. at 528-29). The Supreme Court's reasoning neatly answers the Town's argument, and so we decline the invitation to declare that administering the property tax statutes is a "special need" that exempts tax assessment searches from the Fourth Amendment's proscriptions.[17]
c. Is an "Interior View" a Reasonable Search?
f 44. Because the Fourth Amendment forbids only "unreasonable" searches, we must determine *73 whether—notwithstanding the inapplicability of any recognized exception to the Fourth Amendment—it is nonetheless reasonable to require homeowners to submit to a tax assessor's periodic inspection of the interior of their homes. The basic framework of our inquiry is as follows:
Under our general Fourth Amendment approach we examine the totality of the circumstances to determine whether a search is reasonable within the meaning of the Fourth Amendment. Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.
Samson v. California, 547 U.S. 843, 848 (2006) (internal marks and citations omitted). Because we are addressing the propriety of a potential warrantless home search, we presume it would be unreasonable and therefore unconstitutional. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton, 445 U.S. at 586; see also Camara, 387 U.S. at 528-29 ("[0]ne governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant.") (citing Stoner v. California, 376 U.S. 483 (1964); United States v. Jeffers, 342 U.S. 48 (1951) overruled on other grounds by Rakas v. Illinois, 439 U.S. 128 (1978); McDonald v. United States, 335 U.S. 451 (1948); Agnello v. United States, 269 U.S. 20 (1925)). It is the Town's burden to *74 demonstrate a nonconsensual, warrantless search of the Milewskis[1] home is reasonable even though it does not fit within a recognized exception to the Fourth Amendment.
¶ 45. The Town does not say there is anything peculiar about the Milewskis' home that requires an interior inspection. In fact, its thesis is quite the contrary—it says that every home in the Town of Dover must be open to a tax assessor's inspection without any particularized demonstration of need. Therefore, we understand the Town to be asking us to adopt a bright-line rule that warrantless home searches, conducted by tax assessors in conformance with the requirements of Wis. Stat. ch. 70, are reasonable as a matter of law.
¶ 46. The Town says such searches are reasonable for three reasons. First, they are useful in ensuring compliance with our constitution's "Uniformity Clause." Second, the intrusion is relatively minor. And third, a warrant would be a mere formality, which demonstrates such searches are always reasonable.
i. The Uniformity Clause
f 47. The process by which Wisconsin municipalities raise revenues makes a proper valuation of real property not just important, but essential to fulfillment of the constitutional command that "[t]he rule of taxation shall be uniform . . . ." See Wis. Const, art. VIII, § 1. The process begins with the municipality calculating how much revenue it needs from property taxes. See Jack Stark, The Uniformity Clause of the Wisconsin Constitution, 76 Marq. L. Rev. 577 (1993). It then determines the total value of taxable property in the jurisdiction. Id. at 577-78. Finally, it sets the mill *75 rate[18] at a level that will generate the required revenue. Id. at 578. A property owner calculates his tax liability by multiplying the mill rate by the assessed value of his property. Id. Raising or lowering the assessed value of a particular property, therefore, does not change the amount of revenue the municipality raises. It simply changes the allocation of the tax burden amongst the municipality's property owners. The purpose of the Uniformity Clause is to ensure the tax burden is allocated proportionally to the value of each person's property. Gottlieb v. City of Milwaukee, 33 Wis. 2d 408, 426, 147 N.W.2d 633 (1967) (The purpose of the uniformity clause is "to protect the citizen against unequal, and consequently unjust taxation." (quoting Weeks v. City of Milwaukee, 10 Wis. 186, 201 (1860)).
¶ 48. Satisfying the Uniformity Clause requires not just a uniform tax rate, but a uniform method of determining the value of the property to which that rate will apply.
The act of laying a tax on property consists of several distinct steps, such as the assessment or fixing of its value, the establishing of the rate, etc.; and in order to have the rule or course of proceeding uniform, each step taken must be uniform. The valuation must be uniform, the rate must be uniform. Thus uniformity in such a proceeding becomes equality; and there can be *76 no uniform rule which is not at the same time an equal rule, operating alike upon all the taxable property throughout the territorial limits of the state, municipality or local subdivision of the government, within and for which the tax is to be raised.
Knowlton v. Bd. of Supervisors of Rock Cty., 9 Wis. 410, 420-21 (1859). Our statutes prescribe that uniform methodology: "Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale." Wis. Stat. § 70.32(1).
¶ 49. The Town asserts its home searches are necessary to carry out the Uniformity Clause mandate. It notes that the Wisconsin Property Assessment Manual[19] says "the assessor must make a thorough, detailed, and objective viewing of each property, noting relevant characteristics as they relate to physical condition, effective age, and functional utility." Wis. Dep't of Revenue, Wisconsin Property Assessment Manual, 12-20 (2017) (hereinafter "WPAM"). With respect to real property, Gardiner says the Manual insists on an *77 interior view of all buildings: "In the case of real property, actual view requires a detailed viewing of the interior and exterior of all buildings and improvements and the recording of complete cost, age, use, and accounting treatments." Id. at 10-55. Gardiner also refers to a number of appraisal guidelines emphasizing the importance of interior inspections.
¶ 50. The Town and Gardiner are likely right that an interior view of the Milewskis' home would be the most direct method of obtaining the information necessary to perform a revaluation. But this is only one of the statutorily-prescribed methods of developing a valuation: "Real property shall be valued. .. from actual view or from the best information that the assessor can practicably obtain .. .." Wis. Stat. § 70.32(1) (emphasis added). The statute gives the assessor two potential sources of information with which to develop a valuation. It lists those sources in the disjunctive, and suggests no preference for one over the other.[20] The Manual acknowledges and reflects these options. WPAM at 10-55 ("The statutes require that real. . . property be valued from actual view or the best information obtainable." (Emphasis added.)). So the plain meaning of the statute is that an assessor may develop a valuation out of either source of information.[21]
*78 f 51. The Town's actions, as well as other statutes, tell us that the Uniformity Clause does not require an interior inspection of the Milewskis' home. A homeowner has a statutory right to deny a tax assessor entry, and an assessor who enters anyway is a trespasser. See Wis. Stat. § 70.05(4m), Wis. Stat. § 943.13(4m)(am)4. Yet, securing one's property against the tax assessor does not grind the valuation mechanism to a halt, as the Town itself demonstrated. The Town proved itself capable of valuing the Milews-kis' home notwithstanding its inability to perform an interior inspection. It may be that the valuation is incorrect, as the Milewskis claim, but the Town presumably sought the "best information that the assessor [could] practicably obtain", as allowed by Wis. Stat. § 70.32(1), and developed the valuation accordingly. If proceeding under this alternative was not consistent with the Uniformity Clause, then the Town indicts itself for violating the constitution by assigning a value to the Milewskis' home without an interior inspection. And if the Town based its valuation on something other than an "actual view" or the "best information" practicably available, it has not said what it was or where it obtained the authority to do so. Thus, the Town cannot argue, without contradicting itself, that the Uniformity Clause requires an interior inspection while simultaneously taxing the Milewskis based on a valuation it developed without such an inspection.
*79 ¶ 52. Finally, if the Uniformity Clause does not allow valuations based on the "best information" option (the option the Town appears to have exercised), then the constitutionality of Wis. Stat. § 70.32(1) becomes suspect. But no one has made such an argument, and because we presume our statutes are constitutional, we will not indulge any such speculation. See, e.g., In re Gwenevere T., 333 Wis. 2d 273, ¶ 46 ("Statutes are generally presumed constitutional" and we will not find otherwise unless "there is proof beyond a reasonable doubt that the statute is unconstitutional."). Thus, we conclude that although an interior inspection may be useful, convenient, and expedient in developing a valuation, the Uniformity Clause does not require it.
ii. Minor Intrusion
f 53. The home does not stand on the same footing as other spaces protected by the Fourth Amendment: "[W]hen it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 569 U.S. 1, 133 S. Ct. 1409, 1414, 185 L.Ed.2d 495 (2013). We do not equivocate on this principle. "There can be no doubt that 'the Fourth Amendment has drawn a firm line at the entrance to the house' " and that "it is our duty to zealously guard that line." Sobczak, 347 Wis. 2d 724, ¶ 27 (quoting Payton, 445 U.S. at 590).
¶ 54. So when the Town says a tax assessor's uninvited visit is a "relatively minor" intrusion in one's home, we look closely at what he proposes to do there. Gardiner said it would conduct a "detailed viewing of the interior ... of all buildings and improvements and the recording of complete cost, age, use, and accounting *80 treatments." It says "[i]t is essential that the assessor perform a thorough, detailed, and objective viewing of each property" that is "field verified and accurate." Part of what Gardiner would be seeking is evidence of the home's "effective age," which requires it to carefully consider "abuse, neglect, general maintenance, and all other influences on the physical condition of the improvements." This search requires the assessor to "inspect the interior of a minimum of 90%" of the home. In the process of the search, the assessor scrutinizes such personal spaces as bedrooms, kitchens, basements, and bathrooms. If this was a medical examination, "minor intrusion" is not the description that would come to mind.
¶ 55. The Town and Gardiner also say such searches are relatively minor intrusions because they are preceded by notice, and the homeowner has an opportunity to schedule the search. It says this procedure even "gives homeowners time to tuck away any personal property they do not want the assessor to see." While this procedural politeness is certainly welcome, it does nothing to detract from the offense given by the search itself. As Boyd recognized, the Fourth Amendment's principles "apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life." 116 U.S. at 630. The Fourth Amendment is less concerned with the politeness with which the government agent enters a home than it is with the fact he is there at all. "It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property . . . ." Id.
*81 ¶ 56. The Town further asserts the intrusion is minor because it "is clearly less than in searches where the government is checking the homeowner's compliance with civil or criminal rules and the homeowner faces the specter of being found guilty of violations and having to pay fines or criminal consequences." That may be true, but it misapprehends the significance of this constitutionally-protected right. The purpose of the Fourth Amendment is not to provide an opportunity to secret away the fruits and instrumentalities of crime (although it can sometimes have that incidental effect). The point is to protect a person's right to be secure in one's home, to lie in repose, or partake of what activities one wishes, free of the government's watchful eye. The Fourth Amendment's promise is that a person may stand in his door and tell the government agent "you shall not pass": "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ." United States v. U.S. Dist. Court for E. Dist. of Mich., So. Div., 407 U.S. 297, 313 (1972).
f 57. The intrusiveness of a search lies on a continuum; a pat-down incident to a Terry stop[22] might lie near one end, while towards the other end lies a search of one's home so microscopically punctilious that it can pry even into the owner's most private of thoughts.[23] Somewhere along that continuum the gov *82 ernment hits the zealously guarded "firm line at the entrance of the house." Beyond that line there are no minor intrusions.[24]
iii. Warrant
¶ 58. The Town asserts we may deduce the reasonableness of a tax assessor's search by considering what an application for an administrative search warrant might say. Because the assessor has the duty to inspect the interior of everyone's home, the Town argues, every application for an administrative warrant would be the same, and would simply repeat the contents of the notice already sent to the homeowner. With no requirement to find a particularized need for the search, the argument goes, the warrant application process would be a kabuki play ending with the magistrate's predestined approval. If every application necessarily results in issuance of a warrant, then such searches are categorically reasonable.
*83 ¶ 59. We find a parallel to the Town's argument in Camara. There, the Court considered whether a municipal health inspector must obtain a warrant to annually conduct routine interior inspections for evidence of building code violations. It was asserted that the "decision to inspect an entire municipal area is based upon legislative or administrative assessment of broad factors such as the area's age and condition." Id. 387 U.S. at 532. Thus, "[u]nless the magistrate is to review such policy matters, he must issue a 'rubber stamp' warrant which provides no protection at all to the property owner." Id.
¶ 60. The Camara Court disagreed. It noted that in a warrantless inspection regime "the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization." Id. This leaves the building's occupant at the mercy of "the discretion of the official in the field." Id. The warrant requirement exists for the specific purpose of limiting such discretion: "This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search." Id. at 532-33. It concluded that a statutorily-prescribed search regime was no substitute for a neutral magistrate's review before intruding in someone's home. "We simply cannot say that the protections provided by the warrant procedure are not needed in this context; broad statutory safeguards are no substitute for individualized review, particularly when those safeguards may only be invoked at the risk of a criminal penalty." Id. at 533.
*84 ¶ 61. A warrant requirement here would be even more justified than in Camara. There, the health inspector had an indisputable statutory obligation to conduct interior searches. The same is not true here. As we discussed above, the tax assessor may base his valuation on either an actual view of the home or, instead, the "best information" practicably available to him. If he believes the "best information" available still leaves him with insufficient data on which to build a constitutionally-sound valuation for a specific home, he may explain why that is so in his application for an administrative warrant. As in Camara, the warrant will also perform the salutary function of advising the homeowner of the lawful basis for the inspection of his home, describing the search's proper limits, and identifying the assessor as one with authority to search. A warrant requirement in these circumstances would be no meaningless paper-shuffle.[25]
* * *
f 62. A tax assessor's inspection of a home's interior is a search within the meaning of the Fourth Amendment, and so it is presumptively unreasonable —and therefore unconstitutional—in the absence of a warrant. The Town has offered nothing that overcomes that presumption, and so we find that a tax assessor's warrantless search of a home would be unconstitutional without consent.
*85 B. The Dilemma
¶ 63. So the Milewskis really did, and do, face a dilemma. They have a right to challenge the revaluation of their Property, as well as a right to prevent the tax assessor from inspecting the interior of their home without consent. The question now is whether the Town may require them to surrender one as the price for exercising the other. We all learned how to address this type of situation when we were children: Two wrongs don't make a right. It would have been a constitutional wrong to perform a warrantless search of the Milewskis' home in search of taxable value, and it was in fact a constitutional wrong to deprive them of their due process rights. Forcing a person to choose between constitutional injuries does not make the one he chooses any less injurious.
¶ 64. The purpose of giving a right constitutional stature is to protect it from legislative or executive suspension. If, instead of setting two rights at odds, a statute flatly banned judicial review of a tax assessor's revaluation of real property, a brief recitation of our due-process catechism would summarily consign it to the realm of unconstitutional acts. Likewise, a legislative act authorizing an unreasonable search of a person's home would experience a similarly swift demise. Because we can so easily dispatch such obvious assaults, it would be odd if what cannot be done directly could yet be accomplished indirectly through the expedient of juxtaposing one constitutional right against another.
It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act *86 by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold.
Frost v. R.R. Comm'n of Cal., 271 U.S. 583, 593 (1926).[26]
f 65. The attempt to negate one constitutional right by pitting it against another is a gambit not unknown to the law. One of the earlier cases to address this situation, Simmons v. United States, 390 U.S. 377, 394 (1968), considered whether a defendant must choose between his Fourth and Fifth Amendment rights. There, the FBI had conducted a search that netted a suitcase belonging to one of the defendants, Mr. Garrett, which contained incriminating evidence. Id. at 380-81. Mr. Garret faced the same type of dilemma as the Milewskis. Under the rules then obtaining, a motion to suppress the evidence as unconstitutionally procured would require Mr. Garrett to testify that the suitcase belonged to him, but if he did so and the motion failed, his suppression testimony could be used against him at trial. Id. at 389-91. The Court observed that, in contemplating his litigation strategy, "Garret was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." Id. at 394. He opted for the suppression motion, which *87 failed, and the government used his suppression testimony to obtain a conviction. See id. at 389. The Simmons Court recognized the "undeniable tension" this type of situation creates, and concluded that it is "intolerable that one constitutional right should have to be surrendered in order to assert another." Id. at 394.
¶ 66. The Eleventh Circuit Court of Appeals considered a similar undeniable tension, but there it was between the First and Fourth Amendments. Bourgeois v. Peters, 387 F.3d 1303 (11th Cir. 2004). Mr. Bourgeois wished to attend a political protest, but the city of Columbus, Georgia required all those entering the protest site to submit to a metal detector search. Id. at 1306-07. The City argued that relinquishing one of the constitutional rights was consensual because no one was under an obligation to attend the protest. See id. at 1324. Those who valued their speech and assembly rights more highly than their right to be free of unreasonable searches, the City said, would voluntarily submit to a search. See id. Those who valued their Fourth Amendment rights more highly would forego attendance at the protest. See id. Either way, the potential attendees knew the price of exercising their rights, and chose accordingly. See id. There is more than an echo of this argument in the Court of Appeals opinion, which reasoned that the Milewskis "were well informed of the repercussions of refusing Gardiner's reasonable request to view the interior of their home, and Plaintiffs chose to abandon their right to challenge the tax assessment before the BOR." Milewski v. Town of Dover, No. 2015AP1523, unpublished slip op., ¶ 21.
¶ 67. The Bourgeois court succinctly described the problem with this type of reasoning: "[T]he very *88 purpose of the unconstitutional conditions doctrine is to prevent the Government from subtly pressuring citizens, whether purposely or inadvertently, into surrendering their rights." Bourgeois, 387 F.3d at 1324-25. It's troubling when the price of a discretionary governmental benefit is loss of a constitutional right; it's simply unacceptable when the State requires a person to sideline one constitutional right before exercising another. As the Bourgeois court observed, "[t]his case presents an especially malignant unconstitutional condition because citizens are being required to surrender a constitutional right—freedom from unreasonable searches and seizures—not merely to receive a discretionary benefit but to exercise two other fundamental rights—freedom of speech and assembly." Id. at 1324. Worse yet, there is no discernible principle that would limit the malignancy. "If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all." Frost, 271 U.S. at 594. We agree with the Frost Court's observation that "[i]t is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." Id.; see also Smith v. Allwright, 321 U.S. 649, 664 (1944) ("Constitutional rights would be of little value if they could be thus indirectly denied.").
f 68. The Milewskis exercised their right to deny the tax assessor's request to inspect the interior of their home. For the exercise of that constitutionally-protected right, they lost the ability to contest their increased tax burden.[27] The constitution may not be *89 put at odds with itself, and we do not countenance penalties on the exercise of constitutional rights.[28] *90 Slochower v. Bd. of Higher Ed. of City of New York, 350 U.S. 551 (1956) (preventing local government from conditioning right to due process on disavowal of the Fifth Amendment protection against self-incrimination); Shelton v. Tucker, 364 U.S. 479 (1960) (preventing local government from conditioning employment on impairment of constitutionally-protected free association rights); see also Harman v. Forssenius, 380 U.S. 528, 540 (1965) ("It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution." (citing Frost, 271 U.S. at 593)).[29] The Milewskis suffered an abridgement of their Fourteenth Amendment rights solely because they exercised their Fourth Amendment rights, which is a real and immediate constitutional injury.[30]
*91 ¶ 69. The only remaining question is whether application of Wis. Stat. §§ 70.47(7)(aa) and 74.37(4)(a) will invariably cause this injury under all circumstances. If they will, we must declare them unconstitutional on their face to the extent they foreclose judicial review of a tax assessor's revaluation.[31] If they do not, of necessity, inflict this injury, then the consti *92 tutional infirmity lies only in how they were applied to the Milewskis. The Milewskis say their challenge is the latter, while the Town says the Milewskis are really arguing that the statutes are facially unconstitutional.
¶ 70. We find only that Wis. Stat. §§ 70.47(7)(aa) & 74.37(4)(a) were unconstitutionally applied to the Milewskis. The former provision states, in its entirety:
No person shall be allowed to appear before the board of review, to testify to the board by telephone or to contest the amount of any assessment of real or personal property if the person has refused a reasonable written request by certified mail of the assessor to view such property.
Wis. Stat. § 70.47(7)(aa). The statute does not, by its express terms, say where the assessor will be when he conducts his "view" of the property. However, it does assume he will be somewhere that requires the owner's consent. If it were otherwise, there would be no need to ask permission—the assessor could simply conduct the "view" without contacting the owner at all. It is not immediately apparent to us that a Venn diagram of "places where an assessor may not be without consent" and "places the Fourth Amendment protects against unreasonable searches" would depict completely overlapping circles. To the extent they diverge, the statutory provision is not facially unconstitutional. This question was not addressed directly, and nothing in the parties' briefs indicates such a divergence is not possible, so we reserve for another day the determination of its facial soundness. We hold only that this statute may not be read to require a "viewing" that would violate the Fourth Amendment.
*93 ¶ 71. The parties have not identified any inherent constitutional infirmity in Wis. Stat. § 74.37(4)(a). This provision simply requires a property owner to comply with the board of review procedures before filing a claim for excessive assessment in circuit court: "No claim or action for an excessive assessment may be brought under this section unless the procedures for objecting to assessments under [Wis. Stat. §] 70.47 . .. have been complied with." § 74.37(4)(a). In this case, however, those procedures included the Board of Review's determination that the Milewskis must submit to an unconstitutional search of their home before presenting their challenge. Because § 74.37(4)(a) incorporated the unconstitutional application of § 70.47(7)(aa), it too was unconstitutionally applied to the Milewskis.
IV. CONCLUSION
¶ 72. Applying Wis. Stat. §§ 70.47(7)(aa) and 74.37(4)(a) in a manner that required submission to a tax assessor's search as a precondition to challenging the revaluation of their property violated the Milews-kis' due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution, and Article I section 1 of the Wisconsin Constitution. Consequently, we reverse the court of appeals and remand to the circuit court for further proceedings consistent with this opinion.
By the Court.—The decision of the court of appeals is reversed and the matter is remanded to the circuit court for further proceedings consistent with this opinion.

 We will collectively refer to all the respondents as the "Town," unless the context requires otherwise.

 We review the unpublished decision of the court of *47 appeals, Milewski v. Town of Dover, No. 2015AP1523, unpublished slip op. (Wis. Ct. App. May 4,2016), affirming the Racine County circuit court's order dismissing the Milewskis' claims (the Honorable Phillip A. Koss, presiding).

 The Uniformity Clause provides that:
The rule of taxation shall be uniform but the legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods. Taxes shall be levied upon such property with such classifications as to forests and minerals including or separate or severed from the land, as the legislature shall prescribe. Taxation of agricultural land and undeveloped land, both as defined by law, need not be uniform with the taxation of each other nor with the taxation of other real property. Taxation of merchants' stock-in-trade, manufactures' materials and finished products, and livestock need not be uniform with the taxation of real property and other personal property, but the taxation of all such merchants' stock-in-trade, manufacturers' materials and finished products and livestock shall be uniform, except that the legislature may provide that the value thereof shall he determined on an average basis. Taxes may also be imposed on incomes, privileges and occupations, which taxes may be graduated and progressive, and reasonable exemptions may be provided.
Wis. Const. art. VIII, § 1.

 All subsequent references to the Wisconsin statutes are to the 2015-16 version unless otherwise indicated.

 Each town creates its own board of review. The town's common council decides who sits on the board, but the members typically include the mayor, town clerk, and such other officers as the council should designate. See Wis. Stat. § 70.46(1).

 The percentages we use throughout this opinion are those reflected in the amended complaint.

 Once the assessor has recorded the assessed values of the town's property on the assessment rolls, the town clerk makes the rolls available for public inspection during what is known as "open book sessions." Wis. Stat. § 70.45.

 The Fourth Amendment applies to the states through the Fourteenth Amendment. See, e.g., State v. Kramer, 2009 WI 14, ¶ 18 & n.6, 315 Wis. 2d 414, 759 N.W.2d 598 (citing Mapp v. Ohio, 367 U.S. 643 (1961)).

 The dissent says one must keep "two realities firmly in mind":
¶ 126 One. The Town's assessor did not enter the interior of the Milewskis' home. No search of the Milewskis' home occurred.
* * *
¶ 128 Two, the Milewskis have received full due process hearings in three courts—in the circuit court, in the court of appeals, and in this court. Furthermore, the Milewskis retained and exer *58 cised rights under the statutes to a hearing in which they challenged the assessment on specified grounds.
Dissent, ¶¶ 125-26, 128. The first of these "realities" is important only if the second is true. It is not.
The Board of Review, relying on Wis. Stat. § 70.47(7)(aa), denied the Milewskis' request to appear and present their challenge to the reassessment because they had refused the home inspection. The circuit court did not address the assessment because it concluded there was no constitutional violation in requiring the Milewskis to allow a home inspection as a precondition to its challenge. The court of appeals reviewed and affirmed this determination. And we are addressing the constitutionality of the statutory scheme, not the assessment of the Milewskis[1] home. So at no time have the Milewskis been able to present their excessive assessment claim to any tribunal.
Not even the Town attempted the dissent's contra-factual argument. Instead, it candidly acknowledged that the Milews-kis lost the right to challenge their assessment by refusing the home inspection, stating, for example, that "the result of this refusal is that they [the Milewskis] would be unable to challenge the assessment." The dissent's position is not supported by the facts or the Town itself.
So the most that can be said of the dissent's argument is that the Milewskis have been able to litigate whether they should be allowed to litigate the new tax assessment. That, of course, is not the same thing as actually challenging the tax assessment, as even the Town admits.

 As we noted in State v. Big John:
The question of which party has the burden of proof on this issue is determined by the application of the five-factor analysis outlined in McCormick, Handbook of the Law of Evidence, § 337 at 787-89 (2d ed. 1972), and adopted by this court in State v. McFarren, 62 Wis. 2d 492, 499-503, 215 N.W.2d 459 (1974). The five factors to be considered are: (1) the natural tendency to place the burden on the party desiring change; (2) special policy considerations such as those disfavoring certain defenses; (3) convenience; (4) fairness; and (5) the judicial estimate of probabilities.
State v. Big John, 146 Wis. 2d 741, 755, 432 N.W.2d 576 (1988).

 The dissent is concerned we are restoring the Milewskis' due-process rights without penalizing them for exercising their Fourth Amendment rights. Dissent, f 183 ("According to the lead opinion, a property owner can, without any adverse consequences, refuse an assessor an actual view of the real property and apparently can still contest the amount of the assessment.") First, the suggestion that someone should be penalized for exercising his constitutionally-protected rights is more than a little chilling. And second, we have not said the Milewskis will not suffer adverse consequences from refusing the home inspection. As this paragraph recognizes, their choice may have created substantial impediments to successfully challenging the Town's reassessment. However, the consequences are not a penalty for exercising their rights, but are instead the potential result of applying required evidentiary standards to their claim.

 "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." Wis. Const. art. I, § 11.

 Our references to the Fourth Amendment throughout this opinion also encompass Article 1, sec. 11 of the Wisconsin Constitution unless otherwise noted.

 95 Eng. Rep. 807 (C.P. 1765).

 Trespass, of course, is not the only government intrusion that can cause a Fourth Amendment violation. United States v. *63 Jones, 565 U.S. 400, 411 ("we do not make trespass the exclusive test" for identifying a Fourth Amendment violation).

 "It has long been established that the Fourth Amendment places the greatest protection around the home, as it was drafted in part to codify 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.' " State v. Sobczak, 2013 WI 52, ¶ 11, 347 Wis. 2d 724, 833 N.W.2d 59 (quoting Payton v. New York, 445 U.S. 573, 601 (1980)).

 The dissent justifies nonconsensual, warrantless home inspections as an aid in administration of our property tax laws. But the United States Supreme Court has already rejected that rationale. See G.M. Leasing Corp. v. United States, 429 U.S. 338 (1977). The dissent does not explain how this justification can co-exist with G.M. Leasing Corp.

 Investopedia defines mill rate as follows: "The mill rate, also referred to as the millage rate, is a figure representing the amount per $1,000 of the assessed value of property, which is used to calculate the amount of property tax. The term 'millage' is derived from a Latin word meaning 'thousandth,' with 1 mill being equal to 1/1,000th of a currency unit." See Mill Rate, Investopedia, http://www.investopedia.com/terms/ m/millrate.asp (last visited June 28, 2017).

 The Wisconsin Property Assessment Manual is published by the Wisconsin Department of Revenue as required by statute. The manual must accomplish the following:
The manual shall discuss and illustrate accepted assessment methods, techniques and practices with a view to more nearly uniform and more consistent assessments of property at the local level. The manual shall be amended by the department from time to time to reflect advances in the science of assessment, court decisions concerning assessment practices, costs, and statistical and other information considered valuable to local assessors by the department.
Wis. Stat. § 73.03(2a).

 "[Statutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting Seider v. O'Connell, 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659).

 The dissent says these really are not disjunctive options, and spends most of its analytical space trying to empty all meaning out of the second option into the first. But if the second option really means nothing more than the first, then *78 the legislature acted frivolously when it added that option to the statute. See I Sandborn & Berryman Ann. Stats. (1889) § 1052. We try not to treat legislative enactments as surplus-age. State ex rel. Kalal v. Circuit Court for Dane Cty., 271 Wis. 2d 633, ¶ 46 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage.").

 Terry v. Ohio, 392 U.S. 1 (1968).

 See State ex rel. Two Unnamed Pet'rs v. Peterson, 2015 WI 85, ¶ 18, 363 Wis. 2d 1, 866 N.W.2d 165 (the sought-after information included emails on computers seized during the search).

 One of the concurrences says this statement is too broad. Justice Ziegler's concurrence, f 103. This should be an entirely unremarkable statement, and it is troubling that, apparently, it is not. If we cannot rouse ourselves enough to say this, then maybe Justice Ann Walsh Bradley is right when she said, just this term, that our jurisprudence "continues the erosion of the Fourth Amendment." State v. Floyd, 2017 WI 78, ¶ 48, 377 Wis. 2d 394, 898 N.W.2d 560 (Ann Walsh Bradley, J., dissenting). And if that is the case, then we should stop making grand-sounding statements like "There can be no doubt that 'the Fourth Amendment has drawn a firm line at the entrance to the house'" and that "it is our duty to zealously guard that line." Sobczak, 347 Wis. 2d 724, ¶ 27 (quoting Payton, 445 U.S. at 590). We should say what we mean, and if what we mean is that finding an uninvited government agent trespassing in one's home can be a "minor" intrusion, then it would be far more accurate to say that we lackadaisically observe a permeable line somewhere in or around the house.

 Notwithstanding the striking similarities between the legislative schemes at issue both here and in Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523 (1967), the dissent does not explain why San Francisco needed a warrant, but the Town of Dover does not.

 A sophisticated statutory scheme that deprives the Milewskis of either their Fourth or Fourteenth Amendment rights is no more acceptable than a blunt exercise of legislative authority that accomplishes the same thing. See, e.g., Lane v. Wilson, 307 U.S. 268, 275 (1939). ("The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination . . ..").

 One of the concurrences favors resolving this case on statutory grounds—as a means of avoiding constitutional *89 issues—by interpreting "view" in Wis. Stat. § 70.47(7)(aa) to mean only "exterior view." Chief Justice Roggensack's concurrence, ¶ 92 ("[I]nterpreting 'view such property[1] under Wis. Stat. § 70.47(7)(aa) to be satisfied by an exterior view of the property avoids the possibility that the statutory scheme would operate to infringe the due process rights of a taxpayer by denying the taxpayer the opportunity to be heard."). Because the Milewskis offered Gardiner an exterior view, the concurrence concludes, they satisfied the statute and should have been allowed to challenge the assessment. Id., ¶ 97. But this resolution doesn't avoid the constitutional issue, it just avoids talking about it.
The limiting construction the concurrence would place on "view," it says, is necessary to "save the constitutionality of the statutory scheme." Id., ¶ 94. It must have been the interior inspection that put the statute at risk because that's what the concurrence would exclude from the scope of the term "view." And although it didn't say why the interior view created constitutional peril, it must have been that it would violate the Fourth Amendment. If that were not so, then no "saving" construction would be necessary. So the Chief Justice must have concluded, just as we did, that a nonconsensual, warrantless interior inspection would violate the Fourth Amendment. The only difference between her conclusion and ours is that we said it aloud, while she said it sotto voce. We should say such things aloud.

 The dissent says revoking someone's due process rights is a reasonable "constitutional inducement" to obtain a person's consent to a search of one's home. See dissent, ¶ 170. Constitutionally valid consent, however, must be given freely and voluntarily. See State v. Artic, 2010 WI 83, ¶ 32, 327 Wis. 2d 392, 786 N.W.2d 430 ("The State bears the burden of proving that consent was given freely and voluntarily . .. ."). Stated in the negative, effective consent cannot be "the product of duress or coercion, express or implied ... ." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Threatening someone with the loss of a constitutional right sounds an awful lot like "duress or coercion."

 The Harman Court considered a Virginia statute that forced voters to choose between (a) an onerous yearly registration process and (b) payment of a poll tax. The Court observed that the latter option violated the 24th Amendment, while the former acted as a substantial encumbrance on "[t]he right to vote freely for the candidate of one's choice [, which] is of the essence of a democratic society .. .." Harman v. Forssenius, 380 U.S. 528, 540 (1965) (quoting Reynolds v. Sims, 377 U.S. 533, 555 (1964)). "Restrictions on that right," it said, "strike at the heart of representative government." Harman, 380 U.S. at 540 (quoting Reynolds, 377 U.S. at 555). So Virginia voters were faced with a Milewski-like conundrum: Submit to an unconstitutional poll tax, or suffer an encumbrance on the right to vote that strikes at the heart of representative government. The Harman Court concluded Virginia could not put its citizens to that choice.

 One of the concurrences is concerned by our decision to opine on the "unconstitutional conditions doctrine" because it was not briefed. Justice Ziegler's concurrence, ¶ 101. It is fair to say this subject comprised virtually the entirety of the Milewskis' briefing. As relevant here, the doctrine expresses the basic principle that the State may not put constitutional *91 rights at odds with each other such that a person must surrender one as the price of exercising the other. See, e.g., Slowchower v. Bd. of Higher Ed. of City of New York, 350 U.S. 551 (1956); Simmons v. United States, 390 U.S. 377 (1968); Bourgeois v. Peters, 387 F.3d 1303 (11th Cir. 2004).
That is precisely, and only, what the Milewskis argued. They said they have a due-process right to challenge their tax reassessment, they have the simultaneous right to prevent government agents from searching their home, and they said the statutes told them they had to choose between those rights. We have not addressed anything the parties have not briefed.
The concurrence also says existing cases demonstrate the unconstitutional conditions doctrine is applicable only when the State conditions access to a government-provided benefit upon surrender of a constitutional right. Justice Ziegler's concurrence, ¶ 101. While courts most frequently discuss the doctrine in that context, they also address it in the context of juxtaposed constitutional rights (as we described above). In any event, concluding from this that the doctrine protects access to government benefits but not constitutional rights is to make government benefits a higher order of rights than those protected by our Constitutions. Neither law nor logic supports such a proposition.
Finally, the concurrence agrees the Milewskis could not be constitutionally required to choose between their Fourth and Fourteenth Amendment rights. Justice Ziegler's concurrence, ¶ 100. But it does not explain how or why it would reach that conclusion without aid of the very principles it rejects.

 Soc'y Ins. v. LIRC, 2010 WI 68, ¶ 26, 326 Wis. 2d 444, 786 N.W.2d 385 ("[A] facial constitutional challenge attacks the law itself as drafted by the legislature, claiming the law is void from its beginning to the end and that it cannot be constitutionally enforced under any circumstances . .. .").

 The notice requested an interior view of their home.