# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP940 |

| | |
|---|---|
| COMPLETE TITLE: | Brown County, |
| |         Plaintiff-Respondent, |
| |     v. |
| | Brown County Taxpayers Association and Frank Bennett, |
| |         Defendants-Third-Party Plaintiffs-Appellants, |
| |     v. |
| | Peter Barca, Secretary, Wisconsin Department of Revenue, |
| |         Third-Party Defendant-Respondent. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | March 4, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 16, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Brown |
|   JUDGE: | John Zakowski |

JUSTICES:

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, DALLET, HAGEDORN, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the defendants-third-party-plaintiffs-appellants, there were briefs filed by *Richard M. Esenberg, Anthony F. LoCoco, Lucas T. Vebber* and *Wisconsin Institute of Law & Liberty*, Milwaukee. There was an oral argument by *Anthony F. LoCoco.*

For the plaintiff-respondent, there was a brief filed by *Andrew T. Phillips, Steven L. Nelson, Douglas M. Raines,*

*Christopher E. Avallone* and *von BRIESEN & ROPER, S.C.,* Milwaukee. There was oral argument by *Andrew T. Phillips*.

There was an amicus brief filed on behalf of the Wisconsin Counties Association by *Joseph L. Olson* and *Michael Best & Friedrich LLP*, Milwaukee.

**2022 WI 13**

No.  2020AP940
(L.C. No.  2018CV640)

STATE OF WISCONSIN                :        IN SUPREME COURT

Brown County,

          Plaintiff-Respondent,

     v.

Brown County Taxpayers Association and Frank
Bennett,

          Defendants-Third-Party
          Plaintiffs-Appellants,

     v.

Peter Barca, Secretary, Wisconsin Department of
Revenue,

          Third-Party Defendant-Respondent.

NOTICE

This opinion is subject to further
editing and modification.  The final
version will appear in the bound
volume of the official reports.

**FILED**

**MAR 4, 2022**

Sheila T. Reiff
Clerk of Supreme Court

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court,
in which ROGGENSACK, DALLET, HAGEDORN, and KAROFSKY, JJ., joined.
REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which
ZIEGLER, C.J., joined.

          APPEAL from an order of the Circuit Court for Brown County,
John P. Zakowski, Judge.  *Affirmed.*

¶1 ANN WALSH BRADLEY, J.   This case is before the court on certification by the court of appeals pursuant to Wis. Stat. § (Rule) 809.61 (2017-18) after the circuit court granted summary judgment to Brown County.[1]  The circuit court determined that the County's sales and use tax ordinance was lawful.

¶2 The court of appeals certified the following issue regarding how counties may utilize the proceeds of enacted sales and use taxes:

> Does the sales and use tax Brown County enacted in 2017 and implemented as part of its 2018 budget process "directly reduce the property tax levy," as required by Wis. Stat. § 77.70 (2015-16),[2] if the proceeds are designated to fund new capital projects that collectively would otherwise exceed the levy limits established by Wis. Stat. § 66.0602, but the County could otherwise fund the projects by borrowing?

¶3 The appellant, Brown County Taxpayers Association (BCTA), contends that Brown County's sales and use tax is invalid because it does not dollar-for-dollar directly reduce the County's property tax levy in violation of Wis. Stat. § 77.70.   Rather, BCTA contends that the sales and use tax is impermissibly used to fund new capital projects.

¶4 In contrast, the County asserts that its sales and use tax complies with Wis. Stat. § 77.70.   It argues, in accordance

---

[1] This case arose in the circuit court for Brown County, John P. Zakowski, Judge.

[2] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.   This is the version of the statutes in effect at the time the sales and use tax at issue was passed.   Wisconsin Stat. § 77.70 was amended in 2017, but these amendments do not impact our analysis.

with a longstanding Attorney General's opinion, that pursuant to § 77.70 a sales and use tax may be used by a county to fund any project that could otherwise be paid for with property taxes.

¶5 We conclude that Brown County's sales and use tax ordinance is consistent with Wis. Stat. § 77.70. Section 77.70 does not require a dollar-for-dollar offset to the property tax levy. Instead, it authorizes counties to impose a sales and use tax for the specific purpose of directly reducing the property tax levy, while leaving the means to accomplish that purpose up to the county. Because the County's ordinance does in fact directly reduce the property tax levy by funding projects that would otherwise have been paid for through additional debt obligations, we determine that the ordinance is permissible.

¶6 Accordingly, we affirm the order of the circuit court.

I

¶7 On May 17, 2017, the Brown County Board of Supervisors enacted an ordinance relating to a temporary sales and use tax within the County. The ordinance provided for a 0.5 percent sales and use tax that would be in effect for a period of 72 months.

¶8 Within the ordinance itself is a specification regarding how the money collected from the sales and use tax is to be used. Namely, the ordinance provides that revenue from the tax "[s]hall not be utilized to fund any operating expenses other than lease payments associated with" specified capital projects. It further indicates that the sales and use tax revenue "[s]hall be utilized only to reduce the property tax levy by funding the below listed specific capital projects, as well as funding said specific capital

3

projects' associated costs as deemed appropriate by Brown County administration."

¶9   The expenses for specific capital projects intended to be funded from the sales and use tax revenue include:  (1) $15 million for the Expo Hall project; (2) $60 million for infrastructure, roads, and facilities projects; (3) $20 million for jail and mental health projects; (4) $20 million for a library project; (5) $10 million for maintenance at the Resch Expo Center; (6) $10 million for medical examiner and public safety projects; (7) $1 million for a museum project; (8) $6 million for parks and fairgrounds; and (9) $5 million for a STEM research center project.

¶10  Totaling $147 million, these expenses were determined by members of the County Board to fund "necessary projects" for the "long-term viability of the County."  Without the sales and use tax, the County stated that these capital improvements would have been funded through new borrowing and the accompanying issuance of debt obligations.

¶11 Additionally, the ordinance contained a mill rate[3] freeze.  This provision states:  "While this temporary sales and use tax Ordinance is in effect, the Brown County Mill Rate shall not exceed the 2018 Brown County Mill Rate."  It further provides that if the mill rate does exceed the 2018 rate during the life of the ordinance, that the sales and use tax "shall sunset on December

---

[3] The mill rate "is a figure representing the amount per $1,000 of the assessed value of property, which is used to calculate the amount of property tax." Milewski v. Town of Dover, 2017 WI 79, ¶47 n.18, 377 Wis. 2d 38, 899 N.W.2d 303 (quoted source omitted).

4

31 of the year the Brown County Mill Rate exceeds the 2018 Brown County Mill Rate." A sunset provision is also included in the ordinance in the event the County issues any general obligation debt, excluding refunding bonds.

¶12 Brown County relied on the sales and use tax revenue in crafting its 2018 budget. For that year, the County's finance director estimated the sales and use tax proceeds to be $22,458,333. This amount was incorporated in the 2018 budget, which was adopted by the County Board and signed by the County Executive.

¶13 Shortly after the budget was enacted, BCTA filed suit against the County, arguing that the sales and use tax ordinance violates Wis. Stat. § 77.70. Specifically, BCTA argued that the ordinance does not "directly reduc[e] the property tax levy" as § 77.70 mandates. It sought a declaratory judgment that the ordinance is invalid and an accompanying injunction against the ordinance's enforcement. BCTA's lawsuit was ultimately dismissed without prejudice due to BCTA's failure to comply with statutory notice of claim procedures.[4]

---

[4] The notice of claim statute contains requirements for providing notice to a governmental subdivision prior to filing suit against that subdivision. See Wis. Stat. § 893.80. Such requirements allow governmental entities to investigate and evaluate potential claims and afford them the opportunity to compromise and settle a claim, thereby avoiding costly and time-consuming litigation. Yacht Club at Sister Bay Condo. Ass'n, Inc. v. Village of Sister Bay, 2019 WI 4, ¶20, 385 Wis. 2d 158, 922 N.W.2d 95.

¶14 After dismissal of its lawsuit, BCTA served a notice of claim on the County. The County disallowed the claim and subsequently filed this lawsuit in the circuit court, seeking a declaratory judgment as to the validity of the sales and use tax ordinance. BCTA filed a counterclaim, asserting that the ordinance is void as a matter of law.

¶15 Both parties moved for summary judgment. BCTA renewed its argument that the ordinance does not "directly reduc[e] the property tax levy" as Wis. Stat. § 77.70 requires and that such direct reduction can only be accomplished by a dollar-for-dollar offset. In contrast, the County asserted that the ordinance is valid, suggesting that § 77.70 is an enabling statute that allows a county to impose a sales and use tax but is silent on how sales and use tax proceeds are to be used.

¶16 The circuit court granted Brown County's motion for summary judgment and denied that of BCTA. It concluded that a dollar-for-dollar reduction of the property tax levy with sales and use tax revenue "is not the solely lawful operation required by the plain language of the statute." Further, it determined that "[i]f Wisconsin Statute section 77.70 were to require a dollar-for-dollar reduction of a county's property tax levy, then the Wisconsin Legislature would have said so in the body of the statute, and it would have spelled out the process for Wisconsin counties to follow."

¶17 BCTA moved for reconsideration, which the circuit court denied. Subsequently, BCTA appealed, and the court of appeals certified the appeal to this court.

II

¶18 We are called upon to review the circuit court's determination on the parties' cross-motions for summary judgment. This court reviews a summary judgment decision independently of the decisions rendered by the circuit court and court of appeals, applying the same methodology as the circuit court. MacLeish v. Boardman & Clark LLP, 2019 WI 31, ¶22, 386 Wis. 2d 50, 924 N.W.2d 799. Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

¶19 In our review, we interpret several statutes. Statutory interpretation presents a question of law we likewise review independently of the determinations of the circuit court and court of appeals. Sw. Airlines Co. v. DOR, 2021 WI 54, ¶16, 397 Wis. 2d 431, 960 N.W.2d 384.

III

¶20 We begin by setting forth necessary background regarding the statutes at issue and county property tax levies. Subsequently, we present and analyze the parties' arguments concerning the validity of the Brown County ordinance at issue.

A

¶21 All counties in Wisconsin, including Brown County, are required by statute to adopt an annual budget. See Wis. Stat. §§ 59.60, 65.90. As part of the budgeting process, Brown County is required to "list all existing indebtedness and all anticipated revenue from all sources during the ensuing year and shall likewise

7

list all proposed appropriations for each department, activity and reserve account during the said ensuing year." § 65.90(2).

¶22 From this data, a county calculates its property tax levy. To do so, it adds the operating levy (the revenue necessary to fund county operations) with the debt levy (the amount necessary to pay debt service on county borrowing). The types of expenditures that make up the operating levy include, among other things, necessary expenses for the operation of the county library system, the county jail, and facility management.

¶23 How the property tax levy is set is governed by Wis. Stat. § 66.0602, which was enacted in 2005. See 2005 Wis. Act 25, § 1251c. Section 66.0602, among other provisions, includes a limit on the amount a governmental subdivision may increase its property tax levy in a given year.

¶24 Pursuant to Wis. Stat. § 66.0602(2), and subject to certain exceptions, a county cannot increase its property tax levy in any year "by a percentage that exceeds the [county's] valuation factor."[5] The "valuation factor" is defined as "a percentage equal

---

[5] In full, Wis. Stat. § 66.0602(2) provides:

Levy limit. Except as provided in subs. (3), (4), and (5), no political subdivision may increase its levy in any year by a percentage that exceeds the political subdivision's valuation factor. The base amount in any year, to which the limit under this section applies, shall be the actual levy for the immediately preceding year. In determining its levy in any year, a city, village, or town shall subtract any tax increment that is calculated under s. 59.57(3)(a), 60.85(1)(L), or 66.1105(2)(i). The base amount in any year, to which the limit under this section applies, may not include any amount to which sub. (3)(e)8. applies.

to the greater of either the percentage change in the political subdivision's January 1 equalized value due to new construction less improvements removed between the previous year and the current" or zero percent. § 66.0602(1)(d). In other words, the amount a county may raise its property tax levy in a given year is tied to the percentage change in net new construction in the county. See Steven Deller & Judith I. Stallmann, Tax and Expenditure Limitations and Economic Growth, 90 Marq. L. Rev. 497, 519 (2007).

¶25 As stated, there are several statutory exceptions to the levy limit. Relevant here is the exception set forth in Wis. Stat. § 66.0602(3)(d) regarding debt service. Pursuant to § 66.0602(3)(d)2.:

> The limit otherwise applicable under this section does not apply to amounts levied by a political subdivision for the payment of any general obligation debt service, including debt service on debt issued or reissued to fund or refund outstanding obligations of the political subdivision, interest on outstanding obligations of the political subdivision, or the payment of related issuance costs or redemption premiums, authorized on or after July 1, 2005, and secured by the full faith and credit of the political subdivision.

Stated differently, the levy limit applies to the operating levy, but not the debt levy. An additional exception to the levy limit applies if a political subdivision's governing body adopts a resolution to raise the levy beyond the statutory limit that is then approved by the electorate in a referendum. § 66.0602(4).

¶26 Levy limits are enforced by the Department of Revenue. Wis. Stat. § 66.0602(6). To aid the Department in enforcing the

9

limits, it uses a Levy Limit Worksheet to ensure that a county has complied with the dictates of § 66.0602. Echoing the statutory exceptions, the Levy Limit Worksheet excludes all sums paid for debt service from the levy limit calculation. In an affidavit filed in the circuit court, the County's finance director described the consequence of this: "In other words, if a county borrows money for a capital project, the principal and interest payments that the county pays on the loan are excluded from the definition of revenues subject to the levy limit."

B

¶27 We move next to address the parties' competing interpretations of Wis. Stat. § 77.70, which provides in relevant part: "The county sales and use taxes may be imposed only for the purpose of directly reducing the property tax levy . . . ."

¶28 When interpreting statutes, we begin with the language of the statute. State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. If the meaning of the statute is plain, we need not inquire further. Id.

¶29 "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id. We also interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id., ¶46.

10

¶30 BCTA contends that there is only one way to occasion a "direct" reduction in the property tax levy—a dollar-for-dollar offset of the levy corresponding to the revenue collected through the sales and use tax. Preventing a hypothetical increase in the property tax levy, BCTA argues, is not the same as "directly reducing" it as the statute requires.

¶31 On the other hand, Brown County contends that the language of Wis. Stat. § 77.70 allows for sales and use taxes to fund any project that could otherwise be funded with property taxes.[6] In the County's view, the sales and use tax at issue was enacted to avoid raising the property tax levy to pay for the capital projects identified in the ordinance. Accordingly, the County argues that it was enacted "for the purpose of" funding projects that otherwise would have been funded through property tax revenue. It asserts that, without the sales and use tax, the subject capital projects would have been funded by borrowing money, thereby increasing the County's debt burden, which in turn would be passed on to taxpayers via the property tax levy.

¶32 For further support, the County points the court to an attorney general's opinion on the proper interpretation of Wis. Stat. § 77.70. Our precedent indicates that a well-reasoned

---

[6] Peter Barca, the secretary of the Department of Revenue, is also party to this case, but he does not take a position on the issue of whether Brown County's sales and use tax complies with state law. Instead, Secretary Barca's brief focuses only on the remedy in the event the tax is unlawful. Because we conclude that the sales and use tax is lawful, we need not address this remedy issue.

11

attorney general's opinion is of at least some persuasive value when a court later addresses the meaning of the same statute. Town of Vernon v. Waukesha County, 102 Wis. 2d 686, 692, 307 N.W.2d 227 (1981).

¶33 In 1998, the attorney general opined on the same issue we face in this case. See Opinion of Wis. Att'y Gen. to Dennis E. Kenealy, Ozaukee County Corp. Counsel, OAG 1-98 (May 5, 1998). The attorney general was asked, "in effect, how funds received from a county sales and use tax imposed under section 77.70, Stats., may be budgeted by the county board." Id. at 1. He concluded that "such funds may be budgeted to reduce the amount of the overall countywide property tax levy or to defray the cost of any item which can be funded by a countywide property tax." Id.

¶34 The attorney general's analysis began with a brief history of Wis. Stat. § 77.70: "Prior to 1985, counties had the authority to impose sales and use taxes, but the Wisconsin Department of Revenue was required to distribute all of the net proceeds of such taxes to towns, cities and villages within the county imposing the tax." Id. Presumably because they could not keep the revenue collected, few, if any, counties imposed a sales and use tax. Id. In 1985, § 77.70 was amended "to allow county governments to retain the net proceeds of the sales and use tax," as long as those proceeds are used for the purpose of directly reducing the property tax levy. Id. at 2 (citing 1985 Wis. Act 41).

¶35 Next, the attorney general discussed how after this amendment, counties utilized one of two ways to demonstrate direct

12

property tax reductions.  Id. at 2.  Some counties illustrated a property tax reduction "by showing the receipt of sales and use tax revenues on individual property tax bills."  Id.  Other counties "budgeted the net proceeds of the sales and use tax as a revenue source used to offset the cost of individual items contained in the county budget."  Id.

¶36  In comparing these approaches, the attorney general noted the fundamental fungibility of money, explaining:

> The same amount of countywide property tax reduction occurs whether the county board chooses to budget revenues from net proceeds of the sales and use tax as a reduction in the overall countywide property tax levy or as an offset against a portion of the costs of specific items which can be funded by the countywide property tax.

Id.  Accordingly, in the attorney general's view, "Counties may therefore also budget the net proceeds of the sales and use tax as an offset against the cost of any individual budgetary item which can be funded by the countywide property tax."  Id. at 3.

¶37  We find the County's reading of the statute, echoed by the attorney general's opinion, to be the correct one.  Nothing in Wis. Stat. § 77.70 requires the dollar-for-dollar offset that BCTA seeks.

¶38  On its face, Wis. Stat. § 77.70 requires that a sales and use tax be enacted for the "purpose of directly reducing the property tax levy."  "Purpose" is defined as "the reason why

13

something is done or used" or "the aim or intention of something."[7] Taking this common definition into account, § 77.70 broadly sets out what the goal or aim of a county sales and use tax must be, i.e. direct reduction of the property tax levy.

¶39 The statute does not, however, contain any mechanism by which a county must accomplish such a reduction. Its enabling language allows a county to impose a sales and use tax for the purpose of directly reducing the property tax levy, but it does not mandate that the county use or spend revenue generated by the tax on a dollar-for-dollar offset.

¶40 As the attorney general concluded in 1998, money is fungible. Due to this essential fungibility, there is not one sole way to attain the "purpose" of reducing the property tax levy. Indeed, an identical reduction in the property tax levy can be accomplished from a dollar-for-dollar offset as can be attained by budgeting specific items, which otherwise would have been paid for from property tax revenue, to be funded with a sales and use tax. Either way, the purpose of directly reducing the property tax levy is accomplished. Thus, Wis. Stat. § 77.70 allows revenue generated from county sales and use tax to be used to fund any project that could otherwise have been paid for from property tax revenue.

---

[7] Purpose, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/purpose (last visited Feb. 14, 2022); see also State v. Sample, 215 Wis. 2d 487, 499, 573 N.W.2d 187 (1998) ("For purposes of statutory interpretation or construction, the common and approved usage of words may be established by consulting dictionary definitions.").

¶41 Contrary to BCTA's argument, such a conclusion does not read the word "directly" out of the statute. "Direct" means "to cause to turn, move, or point undeviatingly or to follow a straight course."[8] It is just as straightforward for a specifically-funded project to cause a reduction in the property tax levy as it is for an offset to do the same. Stated differently, using the proceeds from a sales and use tax to fund a specific project that would otherwise have been funded with property tax revenue accomplishes a "direct reduction" of the property tax levy the same way a dollar-for-dollar offset would.

¶42 A comparison with surrounding statutes is additionally instructive in reaching our conclusion. See Kalal, 271 Wis. 2d 633, ¶46. Specifically, the legislature enacted two nearby statutes for the purpose of funding sports stadiums and in those statutes it explicitly directed the stadium districts on how to utilize proceeds of sales and use taxes. Wisconsin Stat. § 77.705, passed in 1995 to fund construction of Miller Park (now American Family Field),[9] authorizes a "local professional baseball park district" to "impose a sales and a use tax . . . at a rate of no more than 0.1 percent of the sales price or purchase price." Similarly, Wis. Stat. § 77.706, enacted in 1999 for improvements to Lambeau Field, authorizes a "local professional football

---

[8] Direct, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/direct (last visited Feb. 14, 2022).

[9] For further background on Wis. Stat. § 77.705, see Libertarian Party of Wisconsin v. State, 199 Wis. 2d 790, 796-800, 546 N.W.2d 424 (1996).

stadium district" to "impose a sales and a use tax . . . at a rate of 0.5 percent of the sales price or purchase price."

¶43 Unlike Wis. Stat. § 77.70, both of these statutes explicitly provide that the proceeds from the sales and use taxes are to be spent to pay down the stadium districts' debt in a dollar-for-dollar manner. Both Wis. Stat. §§ 77.705 and 77.706 contain identical language indicating that any money received "shall be used exclusively to retire the district's debt." §§ 77.705, 77.706.

¶44 In contrast, Wis. Stat. § 77.70, while setting forth that the "purpose" of the sales and use tax must be to "directly reduc[e] the property tax levy," is silent on how this is to be accomplished. If the legislature wanted to mandate a dollar-for-dollar offset of property taxes, it could have done so in a manner similar to the language of Wis. Stat. §§ 77.705 and 77.706. See also Wis. Stat. §§ 229.685(1) and 229.825 (further restricting how stadium tax revenues must be spent); Southport Commons, LLC v. DOT, 2021 WI 52, ¶32, 397 Wis. 2d 362, 960 N.W.2d 17 ("The legislature is presumed to carefully and precisely choose statutory language to express a desired meaning." (internal quotation omitted)).

¶45 Our interpretation is also supported by the analysis employed by the attorney general in the 1998 opinion on Wis. Stat. § 77.70. See OAG 1-98. The attorney general correctly based his opinion on the essential fungibility of money and the principle that the same reduction in the property tax levy occurs regardless

16

of whether the proceeds are budgeted as an offset on the bills of taxpayers or used to fund a specific item.

¶46 Although the parties in this case argue over the proper weight to give an attorney general's opinion in our analysis, we need not and do not resolve that question because the attorney general's analysis was substantively correct. In other words, we do not rely on any presumption or deference to the opinion of the attorney general,[10] but conclude that the analysis itself is persuasive and faithful to our principles of statutory interpretation.

¶47 We therefore determine that Wis. Stat. § 77.70 does not require a dollar-for-dollar reduction in the property tax levy. Instead, it authorizes counties to impose a sales and use tax for the specific purpose of directly reducing the property tax levy, while leaving the means to accomplish that purpose up to the county.

¶48 BCTA asserts next that Wis. Stat. § 66.0602, which was passed subsequent to the issuance of the 1998 attorney general's opinion, changes this result. It focuses on the levy limit contained in that statute, which provides in relevant part: "Except as provided in subs. (3), (4), and (5), no political subdivision may increase its levy in any year by a percentage that exceeds the political subdivision's valuation factor."

---

[10] See Staples for Staples v. Glienke, 142 Wis. 2d 19, 28, 416 N.W.2d 920 (Ct. App. 1987) (treating an attorney general's opinion "as presumptively correct, when the legislature later amends the statute but makes no changes in response to the attorney general's opinion").

§ 66.0602(2). Due to this levy limit, BCTA argues that the County could not have raised its property taxes by the amount needed to cover the capital expenditures intended to be funded by the sales and use tax.

¶49 Putting a finer point on it, BCTA argues that Wis. Stat. § 66.0602(2) indicates that the County's property tax levy may be increased only by a percentage that does not exceed the County's valuation factor. By funding new projects to the tune of $147,000,000 over six years, BCTA asserts that the County vastly exceeds the statute's restriction on property tax levy increases. Stated otherwise, the projects could not have been paid for from property tax revenue because property taxes could not have been legally raised to such a level. For example, the County sought to use almost $18,000,000 collected from sales and use tax to fund new capital projects in 2018. However, the County's 2017 property tax levy was $86,661,972, and its 2018 levy limit was $87,584,261, a difference of just under one million dollars.[11]

¶50 We disagree with BCTA's argument on this point. BCTA focuses on Wis. Stat. § 66.0602(2) at the expense of the exception to subsec. (2) noted in § 66.0602(3)(d). Pursuant to subdivision (3)(d)2., "The limit otherwise applicable under this section does not apply to amounts levied by a political subdivision for the payment of any general obligation debt service." In other words,

---

[11] The record contains a reference to a higher number, $91,115,007, as the allowable 2018 debt levy limit. We use here the lower number provided in the 2017 Levy Limit Worksheet provided to the Department of Revenue, but the number chosen does not affect the analysis.

18

any debt levy is not taken into account in determining the levy limit under subsec. (2).

¶51 Here, the record reflects that the County would have, in the absence of the sales and use tax, issued general obligation debt to pay for the projects identified in the ordinance at issue. Payments on such debt service are exempt from the levy limits, meaning that contrary to BCTA's argument the property tax levy could have been raised to pay for the subject capital projects.

¶52 Having determined that Wis. Stat. § 77.70 describes what must be done with county sales and use tax proceeds but not how to accomplish that, we address next whether the Brown County sales and use tax ordinance at issue does in fact "directly reduc[e] the property tax levy." In examining the record, it is apparent that the answer is yes.

¶53 The County's finance director detailed the effect of the sales and use tax on property taxes vis-à-vis borrowing that would have taken place absent the implementation of the sales and use tax. Specifically, the finance director averred that the subject projects would have otherwise been funded through the issuance of additional debt obligations. Such debt obligations would cause County property taxpayers to pay extra costs associated with the borrowing, including over $13 million in interest over the lifetime of the ordinance and $47 million in total interest, assuming a 20-year term on the loan and thus a 20-year life of the debt service.

¶54 Absent the sales and use tax, property taxes would have to increase to cover the increased debt burden (and as indicated above, debt service is excluded from the levy limit). The

19

operation of this principle can be illustrated with a micro-level example.  In this case, Brown County's finance director stated that if the sales and use tax remains in place, property taxes on the median home value in the County would decrease by $140.20 between 2018 and 2023.  If there were no sales and use tax, and the County instead borrowed money for the subject projects, the issuance of general debt obligations would cause taxes on that same median property to increase by $356.48 in the same time period.  Thus, the sales and use tax saves the median Brown County property owner $496.68——a direct reduction.

¶55  In sum, we conclude that Brown County's sales and use tax ordinance is consistent with Wis. Stat. § 77.70.  Section 77.70 does not require a dollar-for-dollar offset to the property tax levy.  Instead, it authorizes counties to impose a sales and use tax for the specific purpose of directly reducing the property tax levy, while leaving the means to accomplish that purpose up to the county.  Because the County's ordinance does in fact directly reduce the property tax levy by funding projects that would otherwise have been paid for through additional debt obligations, we determine that the ordinance is permissible.

¶56  Accordingly, we affirm the order of the circuit court.

*By the Court.*—The order of the circuit court is affirmed.

¶57 REBECCA GRASSL BRADLEY, J. *(dissenting).*

"When I use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean——neither more nor less."

"The question is," said Alice, "whether you can make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master——that's all."

Lewis Carroll, Through the Looking-Glass and What Alice Found There 124 (London, Macmillan & Co. 1899).

¶58 The Wisconsin Legislature enacted a statute providing "county sales and use taxes may be imposed only for the purpose of directly reducing the property tax levy[.]" Wis. Stat. § 77.70 (2015-16) (emphasis added).[1] Brown County enacted an ordinance imposing a sales and use tax for the purpose of avoiding an increase in the property tax levy. The majority declares the County's ordinance lawful by equating the avoidance of an increase with a reduction. The average American who faces the realities of daily budgeting knows the majority's math does not compute: Although he may prefer to drive a Maserati, he can only afford a Honda, and "avoiding" the loan payment for a Maserati does not mean he "reduces" his budget outlay by purchasing a Mercedes instead of a Honda.

¶59 Defying basic logic, the majority chooses a different meaning for "reducing" than the plain one the legislature gave it.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

1

In order to reduce a property tax levy, it must actually go down. In this case, it didn't.

¶60 The Brown County Board of Supervisors (the Board) decided to spend $147,000,000 on new projects. The property taxes paid by property owners in Brown County were insufficient to fund these projects, so the Board enacted an ordinance imposing a sales and use tax in order to make up the difference. The sales and use tax did not reduce the property tax levy (it actually went up). Nevertheless, the Board maintains the property tax levy otherwise would have had to increase in order to pay for all of the new projects. The Board decided to avoid an increase in the property tax levy by instead imposing a sales and use tax to directly pay for the projects. The majority permits this, contorting a statute designed for property tax relief into a blank check for unaffordable spending. The majority may do so as the masters of law-declaring in Wisconsin, but the statute does not mean what the majority says.

¶61 The majority roots its analysis in a fallacious presumption rather than the statutory text, a foundational error contaminating its entire opinion. The majority relies entirely on an affidavit of the Brown County Finance Director (the Director) insisting the projects "would otherwise have been" funded through issuing debt, which in turn would have required increasing the property tax levy to pay for it.[2] Of course, the County cannot guarantee it could have accomplished the political feat of borrowing $147,000,000 and then increasing the property tax levy

---

[2] Majority op., ¶5.

2

accordingly, which would have required the approval of either a super majority (three-fourths) of the Board, or the County voters via referendum. The majority sidesteps these political hurdles altogether in order to contrive a "reduction" in the property tax levy that never occurred. In accepting the County's baseless presumptions, the majority rewrites Wis. Stat. § 77.70 into a blank check for spending rather than the tax relief for property owners the legislature enacted.

¶62 Chief Justice John Marshall once cautioned "[i]t would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation." Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122, 202 (1819). In this case, the majority exempts "directly reducing" from any operative effect, thereby gutting the express and unambiguous statutory requirement that a county sales and use tax be imposed "only for the purpose of directly reducing the property tax levy[.]" Our judicial duty is to give effect to the legislature's duly enacted statutes by declaring what they plainly mean. See Koschkee v. Taylor, 2019 WI 76, ¶54, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, J., concurring)(citing Tetra Tech EC, Inc. v. Wis. Dep't of Rev., 2018 WI 75, ¶3, 382 Wis. 2d 496, 914 N.W.2d 21 (lead opinion))(explaining "the judiciary's constitutionally-vested authority to say what the law is"). Because the majority chooses a different meaning for Wis. Stat. § 77.70 than the legislature gave it, I respectfully dissent.

I.   BACKGROUND

¶63  In 2017, Brown County enacted a sales and use tax ordinance (the Ordinance) pursuant to Wis. Stat. § 77.70. Section 77.70 authorizes counties to impose a 0.5 percent sales and use tax by adopting an ordinance, provided the tax "may be imposed only for the purpose of directly reducing the property tax levy[.]"  The Ordinance:

> enacts a temporary 72 month, 0.5 percent Brown County sales and use tax, revenues from which:  1) Shall not be utilized to fund any operating expenses other than lease payments associated with the below mentioned specific capital projects; and 2) Shall be utilized only to reduce the property tax levy by funding the below listed specific capital projects, as well as funding said specific capital projects' associated costs as deemed appropriate by Brown County administration, in [the provided] amounts[.]

Introduced as part of the County's "Debt Reduction, Infrastructure & Property Tax Relief Plan," the Ordinance funded nine new capital projects, with total costs of $147 million over six years.[3]

¶64  The Brown County Taxpayers Association and Frank Bennett (BCTA) challenged the Ordinance, claiming it violated Wis. Stat. § 77.70, and the County sought a declaration that the Ordinance was lawful.  The circuit court granted summary judgment to the County and denied BCTA's motion for reconsideration.  After BCTA

_____

[3] The capital projects and their associated costs included: (1) "Expo Hall Project" ($15 million); (2) "Infrastructure, Roads and Facilities Projects" ($60 million); (3) "Jail and Mental Health Projects" ($20 million); "Library Project" ($20 million); "Maintenance at Resch Expo Center Project" ($10 million); "Medical Examiner and Public Safety Projects" ($10 million); "Museum Project" ($1 million); "Parks and Fairgrounds Project" ($6 million); and "Stem Research Center Project" ($5 million).

4

appealed, the court of appeals certified the following issue, which we accepted:

> Does the sales and use tax Brown County enacted in 2017 and implemented as part of its 2018 budget process "directly reduce the property tax levy," as required by Wis. Stat. § 77.70 (2015-16), if the proceeds are designated to fund new capital projects that collectively would otherwise exceed the levy limits established by Wis. Stat. § 66.0602, but the County could otherwise fund the projects by borrowing?

## II.  STANDARD OF REVIEW

¶65  "On appeal, '[w]e independently review a grant of summary judgment.'" Skindzelewski v. Smith, 2020 WI 57, ¶7, 392 Wis. 2d 117, 944 N.W.2d 575 (quoting West Bend Mut. Ins. Co. v. Ixthus Med. Supply, Inc., 2019 WI 19, ¶9, 385 Wis. 2d 580, 923 N.W.2d 550).  "The interpretation and the application of [Wis. Stat. § 77.70] present questions of law that we review independently." Jefferson v. Dane County, 2020 WI 90, ¶13, 394 Wis. 2d 602, 951 N.W.2d 556 (citing Dawson v. Town of Jackson, 2011 WI 77, ¶17, 336 Wis. 2d 318, 801 N.W.2d 316).

## III. DISCUSSION

### A.   Plain Meaning of Wis. Stat. § 77.70

¶66  This case turns on the meaning of Wis. Stat. § 77.70. Accordingly, the analysis begins "with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.  "We give statutory language 'its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning.'" Milwaukee Dist.

Council 48 v. Milwaukee County, 2019 WI 24, ¶11, 385 Wis. 2d 748, 924 N.W.2d 153 (quoting Kalal, 271 Wis. 2d 633, ¶45). We interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id. (quoting Kalal, 271 Wis. 2d 633, ¶46). "In construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of the statute." Kalal, 271 Wis. 2d 633, ¶46 (quoting State v. Pratt, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967)).

¶67 The plain meaning of Wis. Stat. § 77.70 permits counties to impose a sales and use tax "only for the purpose of directly reducing the property tax levy[.]" The County acknowledges this statutory requirement but argues it "does not require counties to 'use' or 'spend' sales and use tax proceeds only for that purpose." The majority agrees, concluding the statute does not specify the means by which counties must accomplish the direct reduction.[4]

¶68 The majority errs by allowing "for the purpose of" to swallow "directly reducing" altogether.[5] The statutory "purpose" language, however, does not alter (much less eviscerate) the meaning of the "directly reducing" clause. Instead, it merely indicates to what end the tax may be imposed: "directly reducing the property tax levy."

¶69 Even if the statute gives counties some latitude to determine the mechanism by which to "directly reduc[e] the property

---

[4] Majority op., ¶5.

[5] Id., ¶¶38-39.

6

tax levy," the County did not reduce the property tax levy at all, much less "directly." The adverb "directly" means "[i]n a direct line or manner" or "[w]ithout anyone or anything intervening."[6] It is derived from the adjective "direct," which means "[e]ffected or existing without intermediation or intervening agency; immediate."[7] The County's multi-step procedure was anything but direct.[8] Any purported reduction in the property tax levy stemming from avoiding unapproved debt (and any corresponding increase in the levy) by means of a sales and use tax does not "directly reduc[e] the property tax levy"; in fact, the County increased both the property tax levy and the sales and use tax, raising far more revenue than it could have generated through property taxes alone under normal budgeting constraints. Nevertheless, the majority maintains the Ordinance directly reduces the property tax levy "by funding projects that would otherwise have been paid for through additional debt obligations[.]"[9] The majority insists it does not read "directly" out of the statute because "[i]t is just as straightforward for a specifically-funded project to cause a reduction in the property tax levy as it is for an offset to do

---

[6] Directly, The American Heritage Dictionary of the English Language 527 (3d ed. 1992).

[7] Direct, The Oxford English Dictionary 702 (2d ed. 1989); see also Direct, The American Heritage Dictionary of the English Language 527 (3d ed. 1992) ("Having no intervening persons, conditions, or agencies[.]").

[8] See Indirect, The American Heritage Dictionary of the English Language 919 (3d ed. 1992) ("Diverging from a direct course; roundabout. . . . [S]econdary[.]").

[9] Majority op., ¶5.

7

the same."[10] No matter how straightforward the method, neither of those scenarios reflects what actually happened. The County is not directly (or even indirectly) defraying any property tax increase necessitated by its spending choices; instead, it is funding new projects in the first instance with sales and use tax revenues, which the property tax levy could not have otherwise sustained.

¶70 By sanctioning the County's misuse of the statute, the majority's interpretation renders the term, "directly," meaningless. See Kalal, 271 Wis. 2d 633, ¶46 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) ("These words cannot be meaningless, else they would not have been used." (quoting United States v. Butler, 297 U.S. 1, 65 (1936)). In order for the property tax levy to be "directly" reduced, the reduction must occur by the shortest path and "[w]ithout anyone or anything intervening[.]"[11] In order to lawfully use the sales and use tax revenue to fund new spending, the County must first authorize and issue general obligation bonds through statutory procedures under Wis. Stat. ch. 67, then increase the debt levy, necessitating an increase in the property tax levy in the corresponding amount to pay for the debt service. See Wis. Stat. §§ 66.0602(3), 67.045,

---

[10] Id., ¶41.

[11] See Directly, The American Heritage Dictionary of the English Language 527 (3d ed. 1992).

8

67.05. The sales and use tax revenue could then be applied to directly reduce the property tax levy.

¶71 The County's purported "reduction" is not in fact any reduction at all. The County's ability to authorize and issue general obligation bonds is dependent upon the satisfaction of several statutory prerequisites, in addition to following its own debt issuance policies.[12] Because the Ordinance funds new projects that have not been approved for bonding——and therefore have not produced any actual increase in the debt levy or property tax levy——there is nothing to reduce.[13] Calculating savings based on a theoretical increase in debt and property taxes that would have resulted if an alternative funding mechanism had been approved produces nothing but a chimera of a "reduc[tion]" and certainly not a direct one.

¶72 The affidavit of the Director upon which the majority relies, claiming the projects would have otherwise been funded by debt, assumes the County would have satisfied the statutory prerequisites to authorize and issue debt; however, until the debt is actually issued and the property tax levy increased, any purported "reduction" is purely conjectural. "Affidavits in support of a motion for summary judgment must contain evidentiary facts, of which the affiant has personal knowledge." Hopper v.

---

[12] For example, the County's debt service policy limits bonding to projects that cost at least $250,000 or have a project life of at least five years, and spells out additional requirements depending on the type and length of the project.

[13] See Reduce, The Oxford English Dictionary 433 (2d ed. 1989) ("To lower, diminish, lessen.").

9

<u>City of Madison</u>, 79 Wis. 2d 120, 130, 256 N.W.2d 139 (1977) (citing <u>Kroske v. Anaconda Am. Brass Co.</u>, 70 Wis. 2d 632, 641, 235 N.W.2d 283 (1975)); <u>see also</u> Wis. Stat. § 802.08(3)(2019–20). "Portions of affidavits which are made by persons who do not have personal knowledge or which contain allegations of ultimate facts, conclusions of law or anything other than evidentiary facts do not meet the statutory requirements and will be disregarded." <u>Hopper</u>, 79 Wis. 2d at 130 (citing <u>Kroske</u>, 70 Wis. 2d at 641; <u>Walter Kassuba, Inc. v. Bauch</u>, 38 Wis. 2d 648, 652, 158 N.W.2d 387 (1968)). The Director's speculation regarding what might have happened but for the imposition of the sales and use tax is "not proper in support of a motion for summary judgment and is ineffectual to establish evidentiary facts." <u>Id.</u> at 131.

¶73 The Director's assumption that the County would have pursued bonding for these projects falls far short of fact; because he is not the sole decisionmaker nor can he foresee the future, he could not possibly know whether the statutory requirements would have been met. The County Board must issue debt according to the terms of Wis. Stat. ch. 67 as well as its own debt issuance policies. For example, Wis. Stat. § 67.045 prohibits the governing body of a county from issuing bonds unless the county holds a referendum by which its citizens approve the debt issuance or the governing body adopts a resolution to issue the debt by a vote of three-fourths of the members. <u>See</u> Wis. Stat. §§ 67.05(3),[14] 67.045(1)(a), (f). The Director could not possibly possess any

_____

[14] Wisconsin Stat. § 67.05 governs the procedures for issuing bonds, including requirements for adopting initial resolutions or holding a referendum. <u>See, e.g.</u>, Wis. Stat. § 67.05(1)–(3).

10

personal knowledge that the debt <u>would have issued</u>, given the political hurdles to be surmounted.[15]

¶74 The majority contends the surrounding statutes support its interpretation.[16] They don't. While context is important, the statutes cited do not alter the plain meaning of Wis. Stat. § 77.70; if anything, they mirror its mandatory language. See <u>Kalal</u>, 271 Wis. 2d 633, ¶46. Wisconsin Stat. §§ 77.705 and 77.706 were enacted to provide an additional funding source for former Miller Park and Lambeau Field, respectively. Section 77.705 authorizes a "local professional baseball park district" to impose a sales and use tax, requiring that any moneys transferred from or to the relevant appropriation accounts "shall be used exclusively to retire the district's debt." Wis. Stat. § 77.705. Section 77.706 authorizes a "local professional football stadium district" to impose a sales tax and use tax, similarly requiring that any moneys transferred from or to the relevant appropriation

---

[15] For example, ¶5 of the affidavit states the Director was "made aware that the [Board] discussed options for borrowing and funding in relation to county infrastructure and capital needs in early 2017"; ¶¶11-16 address steps in the County's budget process; and ¶¶23-38 speak to the County's financial status <u>after</u> the adoption of the sales and use tax. None of these paragraphs support the Director's assertion that the debt would actually have been approved. Further, ¶¶29-30 and 33, addressing the impact on taxpayers if the County "was forced to borrow"——including the extra costs of borrowing and the increase in taxes——cut against the assertion that the County would have successfully pursued borrowing. In light of these considerable expenses, the County may have chosen to fund only some or ultimately none of the projects to mitigate these costs.

[16] Majority op., ¶¶42-43.

11

accounts "shall be used exclusively to retire the district's debt." Wis. Stat. § 77.706.

¶75 The majority manufactures a distinction between the language of these stadium statutes and Wis. Stat. § 77.70, concluding the legislature is "silent" on how the direct reduction of the property tax levy should be accomplished, and that it could have mandated——as it did in Wis. Stat. §§ 77.705 and 77.706——how to do so.[17] This is a distinction without a difference. While they use different terms because they apply to different funding sources, §§ 77.705 and 77.706 are structurally equivalent to § 77.70. Just as §§ 77.705 and 77.706 require a sales and use tax be "used exclusively to retire the district's debt," § 77.70 requires that a sales and use tax under that section be imposed "only for the purpose of directly reducing the property tax levy[.]" Whatever "contrast" the majority sees in these statutes,[18] each mandates a particular end for which the tax is to be used: to retire the districts' debt and to directly reduce a county's property tax levy. The Ordinance neither operates directly nor actually reduces the property tax levy——regardless of the breadth the majority attaches to "purpose."[19]

B.   The 1998 Attorney General's Opinion and the Impact of Wis. Stat. § 66.0602

¶76 To the extent the 1998 attorney general's opinion suggests a county sales and use tax may fund projects not already

---

[17] Id., ¶44.

[18] Id.

[19] Id., ¶38.

funded by the property tax levy, the opinion——and the majority's reliance on it——is wrong. The opinion responded to a simple allocation question regarding how funds received from a county sales and use tax may be budgeted by a county board. See Opinion of Wis. Att'y Gen. to Dennis E. Kenealy, Ozaukee County Corp. Counsel, OAG 1-98 (May 5, 1998). The attorney general answered, "such funds may be budgeted to reduce the amount of the overall countywide property tax levy or to defray the cost of any item which can be funded by a countywide property tax." Id. at 1.

¶77 The attorney general's opinion compared two budgeting methods used by counties in determining property tax levy reductions: The first involved subtracting the net proceeds of the sales and use tax directly from the total property tax——both shown as single line revenue items in the budget——to determine the net property tax that must be levied.[20] Id. at 2. The second

---

[20] The attorney general referenced the practice of some counties to reflect sales and use tax revenues on individual property tax bills only as a passing remark, not as one of the two identified methods counties used to demonstrate direct property tax reductions, as the majority claims. See majority op., ¶¶35, 45; Opinion of Wis. Att'y Gen. to Dennis E. Kenealy, Ozaukee County Corp. Counsel, OAG 1-98 (May 5, 1998). It is not clear Wis. Stat. § 77.70 even authorizes this method; the attorney general clarified that counties cannot "implement a direct system of tax credits to individual property owners through distribution of property tax bills[.]" OAG 1-98 at 2. Instead, Section 77.70 requires that the "property tax levy" be reduced.

13

involved offsetting the cost of individual property-tax-funded budget items by the net proceeds of the sales and use tax. Id. With regard to offsetting the cost of new as opposed to existing projects, the attorney general opined:

> It would be unreasonable to construe the statutory restriction so that counties which had already started certain projects could use sales and use tax revenues to complete them while other counties contemplating the initiation of similar projects could not use sales and use tax revenues to fund them at all. . . . Counties may therefore also budget the net proceeds of the sales and use tax as an offset against the cost of any individual budgetary item which can be funded by the countywide property tax.

Id. at 2-3. The majority claims the attorney general's opinion relied on the "essential fungibility of money and the principle that the same reduction in the property tax levy occurs regardless of whether the proceeds are budgeted as an offset on the bills of taxpayers or used to fund a specific item."[21] The majority errs by assuming away the statutory and democratic prerequisites for issuing debt. It is unknowable whether the County's voters or a

---

Legislative history confirms this conclusion. 1985 Senate Bill 376, later enacted as 1985 Wisconsin Act 41, included an early amendment limiting the sales tax revenue "only for the purpose of property tax relief." Drafting File, 1985 Wis. Act 41, Legislative Reference Bureau, Madison, Wis. The bill was later amended to include the pertinent language as it currently exists, substituting "property tax relief" with "directly reducing the property tax levy." Id. Senator Feingold explained his amendment requiring the tax provide "property tax relief" "should ensure that the revenue [the sales tax] raises goes directly toward lowering property tax bills." See Measure links property tax relief to county sales tax, Waunakee Tribune, Oct. 17, 1985 at 7. The change in language to directly reduce the levy indicates § 77.70 does not encompass the tax-bill-offset method.

[21] Majority op., ¶45.

14

super majority of the County Board would have approved bonding for the County's proposed new projects. Because no debt was issued to fund the projects, no corresponding property tax increase actually occurred. Consequently, there was nothing to reduce.

¶78 Even if the attorney general's analysis was correct at the time, it no longer accurately reflects the state of property tax "fungibility."[22] The attorney general released his opinion in 1998, before the legislature enacted the levy limits in 2005. See 2005 Wis. Act 25, § 1251c. This statute fundamentally altered the fungibility principle on which the opinion relied because it limited the extent to which counties can increase the property tax levy at will. See Wis. Stat. § 66.0602(2).

¶79 The majority does not dispute that the County could not raise the property tax levy under Wis. Stat. § 66.0602(2) to pay for all of its new projects except under § 66.0602(3)(d)2. That statutory exception allows the County to increase the property tax levy in an amount its new projects would require only by issuing general obligation debt.[23] Quite conveniently, the County asserts and the majority agrees it would have issued general obligation

---

[22] The attorney general's opinion does not come close to contemplating the "careful budgeting process" that the County asserts will be upended by concluding the Ordinance is unlawful. The County emphasized that the circuit court found its budget decisions "were made by 'intelligent and talented people' who conducted 'ample research and put considerable thought and effort into determining how the sales and use tax revenue would reduce the property tax levy' and fund new projects." This might be true, but it is hardly the type of situation the attorney general's opinion considered in distinguishing an indirect reduction from a direct reduction.

[23] See majority op., ¶¶50-51.

15

debt to pay for the projects. No one, however, submits any proof of the political will to do so.

¶80 The County's bare assertion flies in the face of Wis. Stat. § 66.0602(2), which prohibits the County from increasing the property tax levy to pay for the projects. Under that statute, the County could not have increased its 2018 property tax levy by more than approximately $1 million dollars, but it sought to spend approximately $18 million in sales and use tax revenues that year to pay for its projects. Undeterred, the majority dismisses this concern by citing the exception under § 66.0602(3)(d)2. for debt service payments.[24] That exception only exacerbates the majority's analytical problems. Instead of providing the County the loophole it seeks, § 66.0602(3)(d)2. introduces an intervening step in the analysis of what "can be funded by a countywide property tax." See OAG 1-98 at 4.

¶81 Applying the attorney general's analysis under the current statutory scheme, the project funding generated by the Ordinance constitutes at best only "indirect . . . property tax relief" because § 66.0602(2) prevents the County from directly increasing the property tax levy to pay for the projects. See OAG 1-98 at 3 ("The term 'directly' has meaning in those instances where budgetary items cannot be funded through a countywide

---

[24] The attorney general's opinion in no way endorsed or even contemplated the use of debt to evade property tax restrictions; rather, that opinion addressed whether new spending funded by sales and use tax revenue could have been "funded by a countywide property tax," not whether a county could have obtained funds through debt financing or some other funding option. See OAG 1-98 at 3.

16

property tax."). The County's plan requires an "intermediate step" to reduce the property tax levy: issuing debt. See id. (defining "directly" as "without any intermediate step"). Because issuing debt requires the approval of County voters or a super majority of the County Board, that intermediate step cannot be taken as a foregone conclusion. While money may be fungible, political will is not.

¶82 The County cannot sidestep Wis. Stat. § 66.0602(2) by simply asserting it would have issued the debt. At a minimum, § 66.0602(2) and (3) demonstrate the indirectness of the County's purported reduction in the property tax levy. Issuing debt for the entire suite of projects may not have been politically or practically feasible under the levy limit statute. The majority and the County conclude that because the County legally could have raised the levy under § 66.0602(3)(d)2., it would have actually done so. Setting aside the statutory hurdles, the County itself warned of "adverse consequences" from taking on "enormous debt," including "significant risk" of a decreased credit rating, additional interest payments, and "passing the interest costs on to county property-taxpayers for many years[.]" It cannot have it both ways. Increasing the property tax levy beyond the levy limit requires multiple steps, including issuing debt only after obtaining the political approvals mandated under Wis. Stat. §§ 67.045 and 67.05, among other constraints. Merely assuming the County could have satisfied these prerequisites circumvents the express language of Wis. Stat. § 77.70.

17

¶83 As a final note regarding the attorney general's opinion, the County's argument that the legislature has acquiesced to the attorney general's interpretation of Wis. Stat. § 77.70 because it has not amended the statute in response to the opinion should be rejected.[25] Although the majority declines to address the issue because it erroneously endorses the opinion, this court has explained that legislative acquiescence is a flimsy basis on which to support a prior construction of a statute because "[n]umerous variables, unrelated to conscious endorsement of a statutory interpretation, may explain or cause legislative inaction." Wenke v. Gehl Co., 2004 WI 103, ¶33, 274 Wis. 2d 220, 682 N.W.2d 405; see also Johnson v. Transp. Agency, 480 U.S. 616, 672 (1987) (Scalia, J., dissenting) ("[I]t [is] impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice."). "Our judicial duty is to say

---

[25] The legislature did amend Wis. Stat. § 77.70 in 2017 to create an exception to the requirement that the sales and use tax be imposed "only for the purpose of directly reducing the property tax levy" for a county that has an electronics and information technology manufacturing zone under Wis. Stat. § 66.0621(3m). See 2017 Wis. Act 58, § 34e. Section 66.0621(3m) provides that a county "may issue bonds under this section whose principal and interest are paid only through sales and use tax revenues imposed by the county under s. 77.70." See 2017 Wis. Act 58, § 18k. The legislature's specific carve-out for § 66.0621(3m) within § 77.70 reinforces the conclusion that the relationship between debt service payments under § 66.0602(3)(d)2. and sales and use taxes under § 77.70 is indirect; the majority's interpretation renders this amendment superfluous.

18

what the law is, not to surmise meaning from legislative quiescence. Legislative inaction cannot support an interpretation of the statute that is contrary to the plain meaning of the language used in the statute." Winebow, Inc. v. Capitol-Husting Co., 2018 WI 60, ¶53, 381 Wis. 2d 732, 914 N.W.2d 631 (Rebecca Grassl Bradley, J., dissenting).

¶84 The attorney general's opinion does not account for the current statutory constraints on a county's ability to increase the property tax levy. Its reasoning rests on the attorney general's personal assessment of the reasonableness of the statute, prompting him to choose a construction that avoids the actual and unambiguous meaning of the language, which the attorney general deemed "unreasonable." For that reason alone the majority should have rejected the opinion. The absurd or unreasonable results canon of statutory construction applies only "when an interpretation would render the relevant statute contextually inconsistent or would be contrary to the clearly stated purpose of the statute." State v. Grunke, 2008 WI 82, ¶31, 311 Wis. 2d 439, 752 N.W.2d 769; see also Scalia & Garner, supra at 237 ("[E]rror-correction for absurdity can be a slippery slope. It can lead to judicial revision of public and private texts to make them (in the judges' view) more reasonable."). It is a misuse of the canon to invoke it as a tool for discarding the plain meaning of an unambiguous statute in favor of an interpretation the attorney general (or a court) prefers. "The oddity or anomaly of certain consequences may be a perfectly valid reason for choosing one textually permissible interpretation over another, but it is no

19

basis for disregarding or changing the text." See Scalia & Garner, supra at 237. The clearly stated purpose of Wis. Stat. § 77.70 is "directly reducing the property tax levy[.]" The County admits it instead enacted the Ordinance "for the purpose of funding capital projects[.]" Regardless of whether the majority feels the legislature's chosen restriction on sales and use tax revenue is "unreasonable," the County was compelled to abide by it but it failed to do so.

### C.   County Budgeting

¶85  Brown County's budgeting procedures show the Ordinance is unlawful. The County defines "capital project" as "an investment in a capital improvement that has a project cost of at least $250,000, is generally non-recurring, and has a service life of five years or more." These projects "are proposed and adopted as part of the annual County budget process." Further, "[f]inal approval of bonding projects [is] subject to: 1) inclusion in the Project Authorization Resolution and 2) financing being secured if funded by bonds or notes. Both steps in this process are subject to final approval by the County Board."

¶86 The County's 2018 budget listed the nine capital projects funded by the Ordinance——subdivided into seventeen "Projects"——under the "Proposed" category, defined as "Projects that are being submitted to the County Board for its consideration and action." In contrast, projects categorized as "Bonded" are those "that have been through the Project Resolution Approval process and for which financing has been secured and approved." Consequently, the capital projects at issue had not been approved

20

for financing——they represented new spending projects not already funded by the property tax levy.[26]

¶87 In his affidavit, the Director stated:

I am familiar with Brown County's May 17, 2017 Ordinance enacting a Sales and Use Tax for the purpose of funding capital projects which it is my understanding and belief would otherwise have been funded through the issuance of additional debt obligations.

It is my belief that revenues to Brown County from the Sales and Use Tax will benefit Brown County taxpayers by lowering the property tax rate, reducing interest expenses on financing projects, and having non-County residents assist with financing through purchases subject to the sales and use tax.

The Director admitted the tax was enacted "for the purpose of funding capital projects which . . . would otherwise have been funded through the issuance of additional debt obligations"——not for the purpose of directly reducing the property tax levy as Wis.

---

[26] The County argues BCTA "would rather have counties plan capital projects, borrow millions of dollars to pay for those projects, take on the costly interest expense associated with the debt, increase property tax levies to pay for the debt, absorb all of the professional costs and fees associated with debt issuance, and then impose a sales and use tax to decrease the debt burden." If the County cannot pay for its projects by increasing its property tax levy under Wis. Stat. § 66.0602(2), then this is what Wis. Stat. § 77.70 requires to directly reduce the property tax levy using sales and use tax revenue. Alternatively, the County could keep its spending within the limits of its property tax revenue and use the sales and use tax revenue to reduce the property tax levy as the statute says. While skirting the statutory requirements may enable the County to circumvent the political hurdles associated with saddling its citizens with costly debt, the County's complaints about the practicalities of statutory compliance are properly addressed to the policymakers in the legislature rather than this court. See United States v. Butler, 297 U.S. 1, 79 (1936) (Stone, J., dissenting) ("For the removal of unwise laws from the statute books appeal lies, not to the courts, but to the ballot and to the processes of democratic government.").

21

Stat. § 77.70 requires. Tellingly, in the 2018 Brown County Executive Budget Message, the County Executive extolled the benefits of the new sales and use tax without any mention of reducing the property tax levy:

> Through the use of a temporary 72-month sales tax, we will cut the county's debt in half, eliminate bonding for six years, avoid mountains of interest by paying cash for projects, and make over $147 million in needed investments to county infrastructure and facilities which have been put off for far too long.

¶88 Unless the property tax levy had already accounted for these projects——for example, if the debt had been issued and the property tax levy increased——the purpose of the Ordinance is not to reduce the levy at all. Rather, the purpose is to avoid increasing the levy through additional debt obligations. While this purpose might be fiscally sound and politically attractive, it does not satisfy Wis. Stat. § 77.70. Avoiding an increase is not equivalent to a direct reduction. While the Director could know the County would have sought to fund the projects through issuing debt, it is simply not the case that he——or anyone——could know the debt would actually have been approved and issued.

¶89 The Director also claimed the Ordinance "will result in direct property tax savings every year from 2019 through 2023." Any "savings" are illusory. The Director explained:

> If the Sales Tax remains in place, taxes on a property assessed at $163,200 (the median value of a home in Brown County) would decrease by $140.20 between 2018 and 2023.

> However, if there was no Sales Tax, the issuance of general obligation debt would result in taxes on that same median property increasing by $356.48 between 2018 and 2023.

22

> The difference is a savings of $496.68 for the typical Brown County homeowner of a median property as a direct result of the sales and use tax.

While this calculation is useful for the County to compare the fiscal impact of alternative funding mechanisms, it does not show an actual reduction in the property tax levy. The County calculates the property tax savings based on a comparison between two alternatives——imposing the sales and use tax and increasing the debt levy. Because bonding represented an alternative method rather than the status quo, its avoidance does not produce a reduction in the tax levy under Wis. Stat. § 77.70. The proper baseline for determining whether the sales and use tax "directly reduc[es] the property tax levy" is the existing property tax levy.

¶90 The County is using its sales and use tax to "pay[] cash" for new capital projects.[27] Wisconsin Stat. § 77.70, however, allows the sales and use tax to be used only to reduce the property tax levy. By paying for the projects up front with sales and use tax revenues instead of bonding, the County decided the costs of those projects should be borne by sales and use taxpayers instead of property taxpayers. This was not the County's decision to make. Wisconsin Stat. § 77.70 limits the purpose of the sales and use tax to "directly reducing the property tax levy"; the legislature accordingly reserved for itself the policy choice of allocating tax burdens among different payors. For example, the County

---

[27] At a County Executive Committee meeting, the County Executive stated the Ordinance "would contain the specific numbers for each of the buckets, but not the specific projects because in the end, the projects are approved through the budget process. What is changing is that the County would be paying cash for projects that we know are coming forward instead of increasing debt and increasing the property tax levy to pay for the projects."

23

Executive "oppose[d] county property taxpayer funding of the new arena." The County Executive's desire to prematurely offload new project funding from property taxpayers to sales and use taxpayers is inconsistent with the statutory limitation on the imposition of sales and use taxes: to directly reduce the property tax levy. Under the statutory scheme, property taxpayers must assume the initial burden of debt to fund new projects, provided the County Board musters the political capital to pursue issuing debt. Only then may the increased property tax levy be reduced by the sales and use tax. By skipping this step, the County surely avoids the burden of obtaining its citizens' consent to bearing the expense of the Board's preferred projects, but it violates the law in doing so, not to mention hiding from property taxpayers the future fiscal impact of the Board's spending.[28]

¶91 The sales and use tax and the property tax impact different groups in different ways, and it is the prerogative of the legislature to determine how those burdens should fall. For example, "[t]he sales tax has generally been thought to be inherently regressive because the proportion of an individual's or family's income devoted to consumption declines as income increases. Persons at lower income levels, therefore, tend to pay a larger share of their income in sales tax." See Sydney Emmerich, Sales and Use Tax, Legislative Fiscal Bureau, Informational Paper

---

[28] For example, one new sales and use tax-funded project in the proposed 2019 Executive Budget——the "Community Treatment Center Crisis Assessment Center"——was estimated to result in a "significant" increase in salary and fringe benefits, necessitating a levy of $1,442,024.

#5, 3 (Jan. 2021); see also Measure links property tax relief to county sales tax, Waunakee Tribune, Oct. 17, 1985 at 7 (quoting Senator Feingold as stating, "The sales tax involves some fundamental inequities which make it basically an unattractive tax").

¶92 Historically, Wisconsin has relied heavily on property taxes. See Noga Ardon, Property Tax Level in Wisconsin, Legislative Fiscal Bureau, Informational Paper #15, 3 (Jan. 2021) ("Wisconsin local governments' heavy reliance on the property tax has contributed to the state's above-average property tax levels."). At the time the legislature enacted 1985 Wisconsin Act 41, it was particularly concerned with high property tax levels. See, e.g., Measure links property tax relief to county sales tax, at 7 (quoting Senator Feingold as stating, "The property tax is still the biggest tax problem facing this state"). "[R]esidential and commercial property have borne increasing shares of the tax burden, while decreasing shares have been borne by manufacturing and other property." See Property Tax Level in Wisconsin, at 4.

¶93 Against the backdrop of these documented concerns, Wis. Stat. § 77.70 reflects the legislature's deliberate policy choice to restrict counties to imposing sales and use taxes "only for the purpose of directly reducing the property tax levy[.]" The County's unlawful imposition of the sales and use tax to avoid issuing debt for financing its increased spending shifts tax burdens in a manner not contemplated by § 77.70. The statute promotes fiscal restraint; it does not provide a blank check for the County to pursue otherwise unfunded projects. In sanctioning

25

the County's budgeting method, the majority upends the policy choices the legislature enacted in § 77.70.

### D.    CONCLUSION

¶94    Wisconsin Stat. § 77.70 expressly provides that "county sales and use taxes may be imposed only for the purpose of directly reducing the property tax levy[.]"  The Ordinance instead avoids a levy increase associated with issuing debt.  While the County attempts to obfuscate the issue by pointing to its "careful budgeting process" and the "adverse consequences" of concluding the Ordinance is unlawful, the legal conclusion is simple:  The County could not increase its property tax levy under Wis. Stat. § 66.0602(2) to pay for its proposed new projects, so it would have to rely on the exception to pay debt service under § 66.0602(3)(d)2.  Because the County never sought the requisite approval for debt issuance under Wis. Stat. ch. 67, the debt levy has not been increased.  The sales and use tax instead paid directly for the new projects rather than being used to directly reduce the property tax levy, which actually increased after the County enacted the Ordinance.  Instead of reducing the property tax levy, the County misused § 77.70 to avoid an increase in property taxes to pay for the County's preferred projects.  Because the County's sales and use tax avoided an increase in the property tax levy rather than reducing it, the Ordinance violates § 77.70 and should be void.  The majority instead upholds it, in derogation of § 77.70; therefore, I respectfully dissent.

¶95  I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

26